[Sac. No. 1206. In Bank.—November 12, 1904.]

H. L. HUSTON, Contestant, Respondent, v. W. A. ANDER-SON, Contestee, Appellant.

ELECTIONS—CONTEST—CUSTODY OF BALLOTS—SUFFICIENCY OF EVIDENCE —BURDEN OF PROOF UPON CONTESTEE.—Where it appears from the evidence that the envelopes containing the ballots were in the same condition as received by the clerk,—intact and unopened,—in the absence of evidence on the part of the contestee, who has the burden of proof to show that they were tampered with, or exposed under such circumstances that they may have been tampered with, or any evidence even raising a suspicion that they were disturbed and tampered with, the ballots were properly admitted in evidence. The burden of proof is not sustained by a naked showing that the ballots might have been more securely kept, and that it was possible for one to have molested them.

[1] 99 Am. Dec. 271.

Id. — Legality of Votes — Registration — Irregular Affidavits. — Voters who were in fact enrolled upon the great register, and whose purported affidavits, apparently proper in form, were contained in the book of affidavits delivered by the county clerk to the board of election of the proper precinct, and who were allowed to vote at the election, cannot be held, after the election, to be illegal voters simply because their affidavits had not been in fact sworn to before the county clerk or any of his deputies.

Id.—Use of Affidavits in Precincts—Object of Law—List of Registered Voters of Precinct.—The object of the law as to the use of the affidavits of the registered voters at the precincts was simply to dispense with the printed copies of the great register, and to afford an authenticated list of qualified voters for the precinct who have in fact been enrolled by the registration officer upon the great register.

Id.—Qualifications of Electors—Effect of Amendment of Code.— The fact that section 1083 of the Political Code prior to the amendment of 1899 provided that persons who were otherwise qualified, and whose names were enrolled upon the great register, were declared to be qualified electors, and that under that section as amended in 1899 qualified electors are only those "who have conformed to the law governing the registration of voters," does not show any material change in the law affecting the question of the qualification of electors, or affecting the rule that a mere irregularity in the method by which registration was secured does not render illegal the votes of registered voters.

Id.—Illegal Votes—Improper Assistance of Voters—Showing Required.—Votes cast by persons assisted to vote by the election officers are illegal under section 1208 of the Political Code, as amended in 1899, unless it appears from the register that each of them "has declared under oath, when he registered, that he cannot read, or that by reason of physical disability he is unable to mark his ballot."

Id.—Inquiry as to Persons Voted for—Error not Ground for Reversal.—Where it appears that persons who were in fact under disability when registered, but who did not then declare on oath their disability, or who declared the contrary, were illegally assisted by members of the board, the court erred in refusing to allow the appellant to inquire how the parties depositing such votes voted as to the office in question; but such error is not ground for reversal where, conceding that they all voted for respondent, he would still have a majority of the votes legally cast.

Id.—Voter Unable to Read English Language—Right to Assistance —Time of Oath of Officers.—Where an affidavit for registration showed the inability of the registered voter to read the constitution in the English language, such voter had the right, on demand, to assistance, regardless of whether or not he had also stated that he could mark his ballot; and the mere fact that the proper oath of

the election officers who assisted him was not taken until immediately after they had assisted him does not invalidate his vote.

ID.—LEGAL RESIDENCE OF VOTER.—Where residence is spoken of in connection with the right of a person to vote, "legal residence" is meant. Every person has in law a residence, which cannot be lost until another is gained. A voter who temporarily removed from the precinct where he was registered, without the intention of making the place to which he removed his home, did not lose his legal residence in the precinct where he was registered, notwithstanding he may not have had any certain house, room, or place therein that he called his home. The question of legal residence is one of fact upon which the finding of the court will not be disturbed.

ID.—DISTINGUISHING MARKS UPON BALLOTS—CROSS IN BLANK SPACE—DOUBLE CROSS.—A cross in a blank space and a double cross after a name are each distinguishing marks which vitiate ballots containing them.

ID.—MARKS NOT DISTINGUISHING.—Under the law as it stood at the general election in 1902, a cross on the parallelogram containing the candidate's name and a cross on the words "Yes" or "No" in voting for a constitutional amendment, instead of in the blank space after the same, are not distinguishing marks.

ID.—INCORRECT DESIGNATION OF VOTING PRECINCTS IN AFFIDAVITS—CORRECTION BY CLERK—LEGALITY OF VOTES NOT AFFECTED.—An incorrect designation of voting precincts in affidavits for registration, which were corrected by the clerk before the time for registration expired, does not render the registration illegal, where the voters registered actually resided in the precincts as corrected by the clerk at the time of their registration, and the correction was made simply to conform to the facts.

ID. — ABSENCE OF CERTIFICATE TO OATH — PRESUMPTION — VOTER NOT PREJUDICED.—Where the registration of a voter was made by a deputy clerk, who failed to certify the registration affidavit, it is to be presumed that the deputy discharged his duty, so far as to administering the necessary oath; and the voter cannot be deprived of his vote by the mere neglect of the deputy to perform his duty by certifying the fact of the oath.

ID.—INITIALS OF ELECTION OFFICERS UPON BALLOT.—Initials upon a ballot which were presumably the initials of election officers, placed thereon during the canvass of the votes, are not a distinguishing mark which vitiates the ballot.

APPEAL from a judgment of the Superior Court of Yolo County. J. W. Hughes, Judge presiding.

The facts are stated in the opinions of the court delivered upon the present and former hearings.

Clark & Clark, and E. R. Bush, for Appellant.

Arthur C. Huston, Charles W. Thomas, and Benjamin A. Martin, for Respondent.

ANGELLOTTI, J.—This is an election contest, the office in question being that of district attorney of Yolo County. It has once been decided by this court in Bank (*post*, p. 331), but, upon petition of both parties, the decision was vacated and a rehearing granted, for the purpose of reconsidering some of the questions involved. Most of the material facts are stated in the opinions, majority and dissenting, heretofore filed.

By the former decision, it was held that upon the face of the legal ballots the respondent had a majority of twenty-one votes, but that the trial court had erred in its conclusion that twenty electors who had voted at the election, but who had the assistance of election officers in the marking of their ballots, although it did not appear from the register that they could not read or by reason of physical disqualification could not mark their ballots, were legal voters. It was also held that there was a similar error in holding that five electors of Knight's Landing Precinct who had not made an affidavit for registration before a proper registration officer were legal voters. The judgment was therefore reversed and the cause remanded for a new trial, such new trial to be confined to the ascertainment of the fact as to how the twenty-five so-called illegal voters voted on the office of district attorney, and the trial court was directed "upon a basis of twenty-one majority in favor of plaintiff ascertained by us from the legal votes cast, to determine from the evidence of such illegal voters whether this majority is lessened, equaled, or overcome, and render a judgment accordingly."

1. Upon a further consideration of the question as to the legality of the five Knight's Landing voters, we are satisfied that they should be held to be legal voters. Our views upon the law applicable to the facts concerning these voters, as the same are set forth in the opinions in this case heretofore filed, are stated in the dissenting opinion filed on the former decision.

In addition to the authorities therein cited in support of the proposition that where a person was in fact entitled to vote, if registered, and he did in good faith attempt to com-

ply with the law in regard to registration, and his name did
in fact appear upon the register furnished by the proper
officer to the election officers, and he was allowed to vote, he
will not, after the election, be held to have been an illegal
voter simply for the reason that there was some irregularity
or informality in the method by which he was registered, the
following cases are cited, viz.: *State* v. *Sadler,* 25 Nev. 131,
174;[1] *Stinson* v. *Sweeny,* 17 Nev. 309; and *Lane* v. *Bailey,*
(Mont.) 75 Pac. 192. See, also, note to *Patton* v. *Watkins,*
90 Am. St. Rep. 58.

In addition to what was said in such dissenting opinion,
it may be said that it is apparent from an examination of the
code provisions applicable thereto, that no material change
was made in this regard by the amendment of section 1083
of the Political Code in 1899. Much reliance is placed upon
the fact that under the section, as it originally stood, persons,
otherwise qualified, whose names were ''enrolled upon the
great register'' were declared to be qualified electors, while
under the section as amended in 1899 only those who have
''conformed to the law governing the registration of voters''
are declared to be such qualified electors. Taken in connection
with the other provisions of the code, these expressions mean
practically the same thing,—viz., that those who have caused
themselves to be enrolled by the proper officer upon the au-
thentic list of electors of the county are qualified electors
thereof. We are speaking, of course, of those who were in
fact otherwise entitled to vote.

Learned counsel for appellant are mistaken in their con-
tention that there is no such thing as a great register other
than the affidavits made by the electors. By the act amend-
ing section 1083 of the Political Code, and providing for the
use of affidavits as a register in the various precincts (Stats.
1899, p. 59), sections relative to the keeping of the great
register, the entry of names therein, etc., (Pol. Code, secs.
1094-1097, 1103, 1105,) were also amended. Under these
sections, as so amended, it is the duty of the person charged
with the registration of voters to keep in his office *''a register
in which shall be entered the names of the qualified electors''*
(sec. 1094), and *therein* to enter the names of the qualified
electors (sec. 1095), the *entry* to show certain facts (sec.

---

[1] 83 Am. St. Rep. 573.

1096), such *entry* to be made on affidavit showing the facts required to be stated in the entry (sec. 1097), and to leave *in such register a blank* for cancellation, which is to be made by *"writing in such blank* the word 'canceled,' and a statement of the reasons therefor, *and by writing in red ink across the face of the affidavit used in procuring such registration the same words as are used in making the cancellation in the great register"* (sec. 1105). By the same act the officer is required to "preserve all affidavits made before himself or his deputies for *the purpose of procuring registration"* (sec. 1103), within fifteen days after the close of registration, arrange such affidavits for each precinct and bind them into a book (sec. 1113), which, together with printed indices, shall be delivered by him to the respective boards of election, and this book of affidavits "shall constitute the register to be used at such election" in the precinct (secs. 1115 and 1116).

The plain object of this legislation as to the use of the affidavits at the precincts, instead of a printed copy of the great register, which was formerly used by the election officers, was simply to dispense with the necessity of printing copies of the great register. Under it, what purport to be the affidavits used "for the purpose of procuring registration" simply take the place of the printed copy of the great register which was formerly used. They no more constitute the register itself than did such printed copy, and when the law says that a book of precinct affidavits "shall constitute the register to be used at such election," it simply means that such book shall constitute the list of voters authenticated by the proper officer as qualified electors of the precinct, which is to be used by the election board. It is an official list of the electors who have in fact been enrolled by the registration officer upon the great register as electors of the precinct. In the official list in use at Knight's Landing Precinct appeared the names and purported affidavits of these five electors. It thus appeared that they had in fact been enrolled by the registration officer in the great register of the county. Having been so enrolled by the registration officer, and being in fact electors of the precinct entitled to vote if registered, they were qualified electors thereof.

2. In regard to the twenty assisted voters, we adhere to the general views expressed in the opinion heretofore filed.

There is no question presented by the record in this case as to the effect of the failure of the registration officer to obtain the necessary information from the elector for the entry to be made on the affidavit and register, or, such information having been obtained, to properly record the same. If it appeared that it was the fault of the registration officer that the register failed to show that the electors, who were in fact unable to mark their ballots, had declared, under oath, when registered, that they could not read, or that by reason of physical disability they were unable to mark their ballots, a different question would be presented, which question it is unnecessary for us to consider on this appeal.

It appeared generally from the affidavits that each of these voters had sworn to a statement that he could read the constitution in the English language, write his name, and mark his ballot. Apart from the undisputed fact that they were not able to mark their ballots, and the fact that some of the affidavits were signed by mark and some by another person at the request of the deponent, there is nothing to indicate that the registration officer did not fully question them as to these matters at the time of registration, or that he did not correctly enter their statements in regard thereto. These facts are not sufficient to support a conclusion that the registration officer did not fully perform his duty in this matter. To so hold would be to practically abolish the statute as to assisted voters.

By the petition for rehearing presented by respondent, it was specially urged that as to the assisted voters, Hiller, Washabaugh, Hill, Gibson, Alexander, Brannigan, and Pulze, the register sufficiently showed them entitled to assistance. The affidavit of Hiller stated that he could read, write, and mark his ballot. The additional statement contained therein, to the effect that he was an invalid, did not show him to be entitled to assistance.

The affidavits of Alexander, Washabaugh, Hill, Gibson, and Brannigan stated that they were not able to write their names, but that they could read the constitution in the English language and mark their ballots. The fact that the registration officer did ascertain and enter the statement that these electors could not write supports the theory that he ques-

tioned them as to all the matters required by subdivision 11 of section 1096 of the Political Code to be shown in the entry in the great register, and correctly set forth their answers thereon. The fact that the register showed that these electors had declared on oath that they could not write their names did not entitle them to assistance. Section 1208 of the Political Code alone prescribes the conditions upon which such assistance may be given, viz.: "When it appears from the register that any elector has declared under oath, when he registered, *that he cannot read, or that by reason of physical disability he is unable to mark his ballot.*" These facts are to be ascertained, as contended by plaintiff, from the entry made on the great register under section 1096 of the Political Code, which provides that such entry must show,—"11. The fact whether or not the elector desiring to be registered is able to read the constitution in the English language and to write his name, and whether or not the elector has any physical disability by reason of which he cannot mark his ballot; and if he cannot mark his ballot by reason of physical disability, then the nature of such disability must be entered." Under section 1097 of the Political Code the affidavit for registration of the voter must show all the facts required to be stated in the entry on the register, except the date of entry. But there is nothing in these provisions to detract from the force of the provisions of section 1208 of the Political Code, even though they were enacted subsequent to the enactment of said section 1208, which is not the case. The provisions referred to above constituted portions of sections 1096 and 1097 at the time of the enactment of section 1208 in its present form, and the subsequent amendments of sections 1096 and 1097 made no change in such provisions.

Upon further consideration of the case of the voter Pulze, we are satisfied that the register showed a case in which, under the provisions of section 1208 of the Political Code, the voter was entitled to assistance. The blank form of affidavit used in the case of this voter was so filled in as to show that he declared under oath at the time of registration that he could not read the constitution in the English language. This presented a case where, under the express provision of the statute, the voter was entitled, on demand, to assistance, regardless of whether or not he had also stated that he could

mark his ballot. It further appeared that he was in fact not able to read or write.

There was evidence sufficient to justify the court in finding that the election officers assisting him did take the oath prescribed by law, to the effect that they would not give any information regarding the manner in which his ballot was marked, and the mere fact that such oath was not taken until immediately after they assisted him should not be held to invalidate his vote.

It follows that Pulze must be taken from the list of illegally assisted voters.

3. It was contended on rehearing by the appellant, and the point was made in his petition for a rehearing, that the voter Walter Grim was an illegal voter, for the reason that he was not on the day of the election a resident of the precinct wherein he voted. He was held by the trial court to have been a legal voter, and the appellant was therefore not allowed to show how he voted. We cannot disturb the finding of the lower court as to this voter. The evidence was sufficient to sustain a conclusion that he had no intention of making the precinct into which he moved his residence. He said that he went there to undertake temporary employment only, intended to return to Woodland when he completed such employment, and did not intend to give up Woodland as his home when he left.

When residence is spoken of in connection with the right of a person to vote, "legal residence" is meant. Every person has in law a residence, and a residence cannot be lost until another is gained. (Pol. Code, sec. 52, subd. 3.) By subdivision 4 of section 1239 of the Political Code it is declared that a person must not be considered to have gained a residence in any precinct into which he comes for temporary purposes merely, without the intention of making such precinct his home, and by subdivision 9 of the same section it is provided that "The mere intention to acquire a new residence, without the fact of removal, avails nothing; *neither does the fact of removal, without the intention.*" If the voter had no intention of making the precinct into which he moved his home, but went there for temporary purposes only, he did not gain a residence there, and consequently did not lose his legal residence in the precinct from which he moved, notwithstanding

that he may not have had any certain house, room, or place therein that he could call his home. That precinct continued to be his legal residence until he gained a legal residence elsewhere. The evidence was such that it might have sustained a contrary finding, but not such as to warrant us in disturbing the finding of the court below. (See, in this connection, *Smith* v. *Thomas,* 121 Cal. 533; *Stewart* v. *Kyser,* 105 Cal. 459.)

4. Upon a further examination of defendant's ballot No. 189, a vote for respondent counted over appellant's objection, we are satisfied that the objection made thereto by appellant was good, and that the vote should not have been counted. There was a plain and distinct impression of a cross in the blank space under the column of socialist candidates. This, under the authorities, must be held to have invalidated the ballot. This error, however, is more than offset by a mistake in the former opinion, in regard to defendant's ballot, or objection, 153. In such opinion it was stated that the court erred in overruling thirty objections of defendant to ballots voted for plaintiff, including No. 153. This ballot was therefore by this court deducted from plaintiff.

It appears from the record of the case that the trial court did in fact sustain defendant's objection to this ballot, and it therefore was not counted for plaintiff in the lower court. It further appears that the only objection to the ballot was one that, as will appear hereinafter, we do not consider to have been a valid objection,—viz., that the voter, in expressing his choice as to constitutional amendments, had placed the cross on the words "Yes" or "No," instead of in the voting square to the right thereof. The objection should not therefore have been sustained by the trial court. Plaintiff should have been credited by us with another vote, instead of being deprived of a vote.

5. As to the other points made by the parties on rehearing, we adhere to the views announced in the original opinion. We have carefully considered appellant's contention relative to "defendant's ballot No. 1." There was, it is true, a tear extending from the top down through a portion of the ballot, but there was no "piece torn out of the top of the ballot," as urged by the objection. The tear was not the kind of mark that a voter would ordinarily place upon a ballot to serve as a

distinguishing mark, and there is nothing in the appearance of this tear to indicate that it was not made accidentally or unconsciously, and, conceding for the purposes of the case that it was among the ballots that had been rejected by the election board, we cannot say that the evidence was such as to compel the conclusion that the tear had been made by the voter. As to another objection made to the ballot,—viz., that the name "R. L. Ogden" had been written on the back thereof,—it appears that the name "R. L. Ogden" was not written thereon, but that the initials "W. H." and "R. L. O." in different handwriting had been written on the back in the upper left-hand corner. There was no pretense in the trial court that these were not, as they appeared to be, initials of some of the election officers, placed on the ballot by them at some time during the canvass by the board of election. The trial court was fully justified in concluding that they were not placed thereon by the voter or prior to the deposit of the ballot in the ballot-box.

We have also fully considered appellant's contention as to the ballots where the cross stamped by the elector to indicate his vote as to constitutional amendments was placed upon the word "Yes" or "No," instead of in the voting square immediately to the right thereof. This question affects five ballots cast for respondent and one cast for appellant. Upon this point we adhere to the views expressed in the original opinion, and in the case of *Tout* v. *Hawkins,* 143 Cal. 104, and *Hannah* v. *Green,* 143 Cal. 19.

The rejection of ballot 189 and the rectifying of the error in regard to ballot 153 leave respondent with twenty-two majority.

According to the views of this court, there were only nineteen voters who may be held to have been illegal voters, and if it be conceded that each of those voted for respondent, he would still have three majority, which is sufficient to support the judgment in his favor.

It follows that the judgment of the superior court must be affirmed, and it is so ordered.

Shaw, J., and Van Dyke, J., concurred.

BEATTY, C. J.—I concur in the judgment of affirmance and in the opinion of Justice Angellotti, except as to the torn

ballot (defendant's ballot No. 1). I think the evidence shows
it was torn by the voter and delivered to the officers in that
condition. A deduction of this vote and of all the illegally
assisted votes from respondent's score would not, however,
change the result.

McFarland, J., and Henshaw, J., dissented.

LORIGAN, J.—I dissent, and adhere to the opinion here-
tofore delivered and published.

The following are the opinions, majority and dissenting,
above referred to, which were delivered in Bank May 12,
1904:—

LORIGAN, J.—This is an election contest, the parties
thereto having been rival candidates for the office of district
attorney of Yolo County at the last general election. The
defendant, upon the official canvass, was declared elected, and
in due time plaintiff inaugurated this contest, based upon
various grounds, which, upon the trial and upon this appeal,
narrowed down to three points—the admission of the ballots
in evidence, and rulings upon alleged illegal ballots, and as to
illegal voters.

Upon the face of the returns, defendant had received 1,575
and the plaintiff 1,567 votes, the plurality of defendant being
eight votes.

After counting the ballots in this contest, and rejecting the
ballots of several illegal voters, the court below found that
plaintiff had received 1,468 and defendant 1,457 votes, giving
to plaintiff a plurality of eleven votes; hence this appeal.

Disposing now of the questions as they are presented:

1. Appellant insists that the court erred in admitting the
ballots in evidence. This applies to the returns of every pre-
cinct in the county, the claim being, that these returns were
not properly and safely kept by their legal custodian, the
county clerk. It is unnecessary to comment at length on the
evidence introduced upon this point. While it is true that
the county clerk might have kept the ballots in a more secure
manner than he did, yet it cannot be said that the evidence
shows anything more than that fact, or that it raises any
stronger inference than that, by reason of this lesser measure

of security, the ballots might have been more easily tampered with than if greater precautions for their safety had been taken. It appears from the evidence that the envelopes containing the ballots were in the same condition as received by the clerk,—intact and unopened,—and there is no evidence even raising a suspicion that they were disturbed or tampered with. The lower court found that they were kept in substantial compliance with the law, and admitted them. As said in *Tebbe* v. *Smith,* 108 Cal. 107: "So, too, when a substantial compliance with the provisions of the statute has been shown, the burden of proof shifts to the contestee of establishing that, notwithstanding this compliance, the ballots have in fact been tampered with, or that they have been exposed under such circumstances that a violation of them might have taken place. But this proof is not made by a naked showing that it was possible for one to have molested them. The law cannot guard against a mere possibility, and no judgment of any of its courts is ever rendered upon one.

"When all this has been said it remains to be added that the question is one of fact, to be determined, in the first instance, by the jury or trial judge; and, while the ballots should be admitted only after clear and satisfactory evidence of their integrity, yet, when they have been admitted, this court will not disturb the ruling, unless we in turn are as well satisfied that the evidence does not warrant it. In this case we do not think the ruling was erroneous."

We think, too, that within this rule, the evidence sufficiently warranted the court in admitting the vote of Woodland Precinct No. 1, specially objected to by defendant.

2. As to illegal ballots: Upon the contest the plaintiff objected to 495 ballots and the defendant to 328, and the validity of the rulings of the court upon these objections is next presented for consideration. The original ballots (excepting some few instances where counsel apparently abandoned their objections and omitted them) by stipulation were transmitted to this court for examination under the objections. The number so transmitted exceeds seven hundred, and the objections urged embrace on one side or the other every conceivable objection which could be raised. We have examined the ballots thoroughly and considered the objections carefully, and, stating the result of such consideration generally, we find that

the court erred in sustaining objections made by plaintiff to nineteen ballots voted for defendant Anderson, and in overruling thirty-one objections of plaintiff to ballots likewise voted for defendant; and it erred likewise in sustaining objections of defendant to twenty-eight ballots cast for plaintiff Huston, and in overruling thirty objections of defendant to ballots likewise voted for plaintiff. As a result of these errors in sustaining or overruling objections, the plaintiff loses thirty votes and gains twenty-eight; the defendant loses thirty-one votes and gains nineteen votes, giving the plaintiff a gain upon this appeal of ten votes, which, with the eleven majority found in his favor by the lower court, makes his present majority twenty-one.

It can be of no benefit to the legal profession to set forth the particular objections urged to the ballots on either side. They involve no novel questions, and under the amendment to the Election Law by the last legislature may never arise again. It may be mentioned, however, that the court sustained objections upon both sides against counting ballots where the voter had stamped a cross on the parallelogram containing the candidate's name after the name, but not in the square, and had stamped a cross either under or on the words ''Yes'' or ''No'' in voting on constitutional amendments, and not in the square. As the law stood (Pol. Code, sec. 1205) when this election took place, the law did not require the cross to be stamped in the square, but only after the name of the candidate (*Tebbe* v. *Smith,* 108 Cal. 109), and as to constitutional amendments, against the answer he desired to give. So in neither case was the stamp a distinguishing mark. The ballots were therefore valid, and should have been counted.

While we do not consider that any practical purpose can be subserved by calling further particular attention to any of the objections urged, yet for the benefit of counsel in the case we will mention those objections by number which the court should have sustained or overruled on account of the sufficiency or insufficiency of the objections.

The court should have sustained plaintiff's objections Nos. 3, 59, 64, 74, 75, 77, 104, 117, 120, 121, 123, 124, 157, 158, 167, 176, 184, 185, 194, 215, 225, 237, 241, 251, 252, 258, 275, 278, 281, 290.

It should have also sustained those of defendant numbered

33, 63, 125, 142, 144, 153, 160, 172, 207, 214, 216, 235, 247, 259, 271, 282, 287, 293, 298, 312, 345, 360, 372, 409, 415, 434, 453, 468, 471, 475.

The following objections of plaintiff should have been overruled: Nos. 21, 92, 115, 119, 160, 161, 179, 198, 203, 207, 208, 214, 234, 248, 249, 268, 269, 272, 289. Likewise those of defendant numbered 10, 19, 20, 29, 50, 80, 89, 92, 159, 163, 165, 174, 185, 186, 213, 266, 290, 291, 303, 316, 317, 321, 368, 381, 435, 447, 467, 485.

The ballot numbered "Deft. 6," which is sent up here to point defendant's objection of the same number, is obviously not the ballot to which he objected, or which should have been marked as his exhibit. It contains a vote in his own favor, and has nothing upon it rendering it in the slightest degree open to the objection he made to it, or to any other objection. It is so apparent that the wrong exhibit was marked and sent up that we pay no attention to the objection.

Defendant's objection No. 399, made in the lower court, was against a ballot containing a vote in his own favor. It was overruled below, and he has urged on this appeal that the ruling was erroneous. The original objection was doubtless through an oversight of counsel, but as he has not abandoned this assignment of error, and presents it on this appeal, and as it is apparent that the ballot is open to the objection he urged against it—a double cross—we are compelled to pass on it, and find that his objection should have been sustained and the ballot rejected—though the effect is to lose him a vote.

Although upon this appeal the majority of the plaintiff has been increased, it cannot avail him for the purpose of an affirmance of the judgment, because, in our opinion, the court committed errors which if not committed might have had the effect of overcoming this majority in favor of defendant, and for these errors a new trial will have to be ordered.

These errors are as follows, and were committed by the court in ruling as to illegal voters:

3. In that regard it is insisted by appellant that the court erred in refusing to permit him to show, by an inquiry of them, how twenty certain persons who had voted at the election cast their votes for the office of district attorney. All these persons had on election day been, at their request, assisted in marking their ballots by members of the election

board at various precincts, and none of them had made oath
on registering that he was unable to read or was under any
physical disability. On the contrary, in addition to the ab-
sence of any statement of the existence of physical disability,
it appeared from their affidavits of registration that they could
all read and mark their ballots, except a voter, Pulze, who in
his affidavit swore that he could not read the constitution in
the English language, but could mark his ballot.

The law provides (Pol. Code, sec. 1208) the conditions un-
der which voters who are unable to read, or are suffering from
physical disability, may have assistance in marking their bal-
lots. It declares that "When it appears from the register that
any elector has declared under oath, when he registered, that
he cannot read, or that by reason of physical disability he
is unable to mark his ballot, he shall, upon request, receive
the assistance of two of the officers of election of different
political parties, in the marking thereof, to be chosen as
follows:" etc.

It will be observed from the reading of this section that it
is only when it appears "from the *register* that the elector
declared under oath *when he registered* that he could not read,
or was physically disabled from marking his ballot," that he
shall receive assistance.

The existence of those matters which shall entitle a voter to
assistance are required to appear in his affidavit of registra-
tion (Pol. Code, sec. 1096), and these affidavits constitute the
precinct register to be used by the election board upon election
day.

It will be found that the test provided for in section 1208
is the only one contained in the election law for determining
whether a voter shall be given assistance or not, and it pro-
vides the only condition upon which assistance can be ex-
tended. No other test is provided for, and no other test is
permissible. When the law has designated a condition under
which a right may be exercised, it is necessary to a valid exer-
cise of that right that such condition should exist. This con-
clusion is strengthened when we take into consideration
previous legislation upon this subject.

When section 1208 of the Political Code was first adopted
it provided that "any elector who declares under oath to the
presiding election officer that he cannot read, and that by

reason thereof, or by reason of physical disability, he is unable to mark his ballot, shall, upon request, receive the assistance of any one of the election officers he may choose in the marking thereof,'' etc. (Stats. 1891, p. 175.)

This section was amended in 1893 (Stats. 1893, p. 307), but was not disturbed as to the oral oath.

In 1895 the section was amended into the present form, which abolished the right theretofore accorded to the voter of making, when he presented himself to vote, an oral oath of his inability to read, or of physical disability which prevented his marking his ballot, and requiring these facts warranting his assistance to appear in his affidavit of registration which would be in the precinct register in the hands of the election board, and an examination of which by them would conclusively determine his right under the law to assistance when he applied for it.

If an examination of the voter's affidavit in the precinct register is not the exclusive method of ascertaining his right to assistance, then the only other way he would be entitled to it would be by a simple request for it, or upon an oral oath establishing his necessity for it, made when he appeared to vote. Now, it cannot be claimed that either of these methods are provided for in the Election Law. No one would seriously contend that he would be entitled to it on a simple request, and if his oral oath was to be accepted (which was not even administered to any of these persons whose votes are here in question), why did the legislature adopt the idle ceremony of repealing the only provision of law which ever accorded it to him, and substituting his affidavit of registration as sole evidence of it?

We are satisfied from the language of the section, and in view of the previous legislation, that the legislature intended that the test of a voter's right to assistance should appear on, and be determined by, an examination of the register by the election officers (the affidavits of registration which constitute the precinct register), and that by amending the law which previously extended the right to make oral oath so as to require the necessary facts to appear in the affidavit of registration, that this latter method was intended by the legislature to be exclusive, and that the provision is mandatory.

We are mindful that cases may arise where the voter be-

tween the day of final registration and the day of election may
become so physically incapacitated as to be unable to mark
his ballot, and as such fact could not appear on the register,
under the view we hold of the section, he could not be per-
mitted to vote. What the rights of a voter under such cir-
cumstances would be,—whether (the law having failed to
make provision for such a contingency, and only contemplat-
ing that the disabilities existing at the time of registration
should appear in the affidavit of registration) the voter would
be entitled to assistance upon taking an oath before the board
of election,—is a matter not here involved, because it appears
from the evidence that all the persons whose votes the appel-
lant challenges as illegal suffered from the disabilities which
they claimed on the day of election entitled them to assistance
when they made their affidavits of registration.

We think these votes were illegal, and that the court erred
in refusing to allow appellant to inquire how the parties de-
positing them voted.

Upon the general proposition of the illegality of these votes
attention is directed to the cases of *Tebbe* v. *Smith*, 108 Cal.
113; *Patterson* v. *Hanley*, 136 Cal. 275, and *Summerson* v.
*Schilling*, 94 Md. 591.

Evidence was taken upon the trial over appellant's objec-
tion which showed that these persons whose votes were chal-
lenged as illegal were in fact on the date of their registration
either unable to read or by reason of physical disability un-
able to mark their ballots.

As the law, however, does not leave the question of the right
of the voter to assistance to be determined by the court when
the legality of such vote is challenged upon a contest, but
requires the voter's right to assistance to appear from his
affidavit as set forth in the precinct register, the court erred
in refusing to permit appellant to question these parties as to
how they voted.

In order to avoid any question upon a new trial as to the
identity of these illegal voters, we give their names as appear-
ing from the record (omitting their initials). They are
Austin, Nickell, Alexander, Jones, Wilger, Pulze, Washa-
baugh, Hill, Gibson, Brannigan, Olsen, Harrington, Valine,
Rose, Peters, Sacramento, La Montagne, Angelo, Thomas,
Adams, and Hiller.

As to additional illegal voters the court also erred in refusing to permit the defendant to show how they had voted for district attorney. The evidence concerning these voters was, that the county clerk had appointed one F. B. Edson, who was engaged in a mercantile business with his brother, T. W. Edson, at Knight's Landing, as a deputy clerk to attend to the registration of voters in the election precinct of Knight's Landing.

During the absence of F. B. Edson, the deputy registration clerk, in the mountains, certain electors came to the store to be registered for the purpose of a party primary. Their registrations were made out by T. W. Edson, who signed the name of his brother thereto as deputy clerk, writing under that signature, as evidence of his action, "per T. W. E." T. W. Edson was not a deputy clerk, and no other registration of these persons was had. These parties were never legally registered, and their votes were illegal. It is contended by plaintiff that their registrations were taken before a *de facto* officer, and were valid. Conceding that if so taken before a *de facto* officer, they would be valid, still T. W. Edson was not a *de facto* officer. A *de facto* officer is one who, though not authorized by law to act in the official capacity he assumes, yet claims to be so authorized, and in fact does act as an officer. T. W. Edson claimed no right to act as deputy clerk; nor did he pretend to be such; neither was he reputed to be a deputy clerk. In fact he did not in these registrations assume to act as a deputy, but simply as a substitute for his brother, whose name he signed as the deputy, "per T. W. E." as his representative.

Any individual in possession of blank affidavits for registration could have prepared them in the same manner, and the same claim could as well be insisted on to sustain their validity.

As section 1083 of the Political Code stood prior to its amendment in 1899, the law required, in order to entitle an elector to vote, only that his "name shall be enrolled upon the great register of the county." The law then, as now, required an affidavit of registration to be made by the voter, but, prior to the amendment, facts contained in the affidavit were enrolled upon the great register, and the entry of the elector's name in the great register was the evidence of his right to

vote. The affidavit was no part of the register. The amendment of this section in 1899 changed this. It is no longer provided that the test of the right of an elector to vote shall be determined by his enrollment on the great register, but an entirely different test is provided, which now is, that he "shall have conformed to the law governing the registration of voters." And, as the law now requires that the affidavits of registration themselves shall constitute the precinct register upon which an elector is entitled to vote, it is essential, in order to so entitle him, that there should be a strict compliance with the law to the extent, at least, that his affidavit for registration should be made before either a *de jure* or *de facto* officer. These illegal voters were Reddington, Faulk, Roberts, Jenkins, and William Adams.

It is insisted by defendant that certain other persons were illegal voters by reason of non-residence in the precincts in which they voted, and that the court erred in not sustaining his inquiry as to how they voted.

Residence is a question of fact in which the intention of the party enters as an important element, and when the court has found upon the matter such finding will not be disturbed unless it appears that there is an absence of evidence to support it. We find no such condition in the record. There was evidence, including the declared intention of all the parties upon the subject, from which the court was warranted in finding that they all resided in the precincts where they voted, and this finding concludes us from reviewing the matter. This applies to the finding by the court upon all claims of residence or non-residence in precincts which are urged by either party upon this appeal.

There is nothing in defendant's contention that certain electors were illegally registered. This claim is based on the fact that after certain voters had registered, is was ascertained that the affidavits of registration contained incorrect designations of their voting precincts, and, at their request, or at the suggestion of the outside deputy registration clerks, who had registered them, but were in doubt at the time as to the lines of the various precincts, and in some instances from his own knowledge, that the names of the precincts inserted were not correct, the county clerk corrected them by inserting the proper precinct names. All these voters in fact actually

resided, when they registered, in the precincts represented by the correction. That the wrong precincts were originally designated was clearly a mistake on the part of the deputy registration officers, or of the voters themselves, and the correction was simply to conform to the fact, and made long before the time for registration expired. Under these circumstances the corrections were properly made, and did not affect the validity of the registration.

Nor is there any merit in defendant's claim that one Marston was an illegal voter. His formal affidavit for registration signed by him was in the precinct register, but there was no jurat of the county clerk thereto showing that he had in fact been sworn. The evidence shows that Marston went to the county clerk's office to be registered, that the county clerk himself prepared his affidavit, and while Marston does not remember whether he took an oath before making it or not, he understood that he was making an affidavit. The clerk did not remember whether the oath was administered or not, but testified that it was usual for himself and deputies to swear the voters when they registered them. As it is made the duty of the clerk and deputies to administer the oath to parties applying for registration, and as the affidavit was inserted by the clerk in the precinct register as that of a person entitled to vote, the court was justified in presuming that the clerk discharged his duty and administered the necessary oath, but neglected certifying the fact. An elector is not required to see that the county clerk certifies his registration affidavit, and when he has done all that the law requires of him to effect registration, he cannot be deprived of his vote by the failure of the clerk to perform his duty.

We have now disposed of all the points raised on this appeal by either party, and from what we have said, the judgment of the lower court must be reversed and a new trial granted.

It only remains to determine to what extent the lower court should proceed upon such new trial.

As all the exceptions of both parties to the action of the lower court in the reception or rejection of ballots are presented in the record, and this court has passed upon them and determined upon review that, from the legal ballots cast, the plaintiff has a majority of twenty-one votes, this determina-

tion is final, and upon a new trial the lower court and the parties shall .be confined to ascertaining how the persons whom we have determined were illegal voters voted for the office of district attorney, and upon a basis of twenty-one majority in favor of plaintiff ascertained by us from the legal votes cast, determine from the evidence of such illegal voters whether this majority is lessened, equaled, or overcome, and render a judgment accordingly.

The judgment is reversed and a new trial ordered, limited to the extent that we have above indicated.

McFarland, J., Henshaw, J., and Beatty, C. J., concurred.

ANGELLOTTI, J., dissenting.—I am unable to concur in the judgment of reversal.

I concur in the opinion, except as to the portions thereof relating to assisted voters and to the voters whose purported affidavits were taken by T. W. Edson.

The first class numbered twenty and the second class five. I am not prepared to say that the twenty assisted voters were not illegal voters, but in the view I take of the case it is unnecessary to determine whether or not they were.

By the recount plaintiff has twenty-one majority. Assuming all of the assisted voters to have been illegal voters, and that they all voted for him, he would still have a majority of one after the deduction of their votes.

To reverse the judgment it is therefore essential to hold, as does the majority opinion, that the five voters whose so-called affidavits were taken by T. W. Edson were also illegal voters. I cannot concur in this conclusion.

The evidence showed that each of these voters had resided in the precinct for over twenty years, and had voted in that precinct before. There is no claim that they did not possess all of the qualifications of electors as prescribed by the constitution. (Const., art. II, sec. 1.) They were electors of the precinct. (*Bergevin* v. *Curtz,* 127 Cal. 86.)

The objection is not that these voters were not electors of the precinct in which they voted, but that they had not "conformed to the law governing the registration of voters," which is by section 1083 of the Political Code, as amended in 1899, made a condition precedent to the right of an elector

to exercise the privilege of voting. It is well established that the legislature may make reasonable regulations for the registration of voters, for the purpose of providing "a means whereby the elector who is entitled to vote may be known by having his name enrolled upon an authentic list," and that it may require electors to comply therewith as a condition precedent to voting.

The validity of the provision of section 1083 of the Political Code relied on by defendant is not therefore to be doubted, but that provision means no more than that the elector shall have in good faith procured his registration as an elector, so that his name appears upon the authentic list provided by law.

This had been done in the case at bar. It is not claimed that the names of these five voters were not entered upon the great register of the county kept in the office of the county clerk (Pol. Code, secs. 1094-1096), and what purported to be the affidavits used for the purpose of procuring their registration (Pol. Code, sec. 1103) were contained in the book of affidavits delivered by the county clerk to the board of election of the precinct, to be used as the register at such election. (Pol. Code, sec. 1116.)

The purported affidavits signed by the voters, were, on their face, without fault, the "Per T. W. E." referred to in the majority opinion having been stricken out in the office of the county clerk, and they had been received by that officer as sufficient affidavits for the purpose of registration.

The real objection is that the statements of the voters, forwarded by their procurance to the office of the clerk for the purpose of obtaining registration, had not in fact been sworn to by them before the county clerk or any of his deputies.

The provision that no name shall be entered upon the register of the clerk except upon an affidavit made before the clerk or one of his deputies is directed entirely to the county clerk (Pol. Code, sec. 1097; *State* v. *Lattimore,* 120 N. C. 426 [1]), and while the clerk should not register an applicant without such an affidavit being made, and while perhaps a registration made without the prerequisite of a sufficient affidavit might be canceled at the suit of any person as having been illegally made (Pol. Code, sec. 1109), the registration is not void.

---

[1] 58 Am. St. Rep. 797.

In *Davis* v. *O'Berry*, 93 Md. 708, it was held, in a proceeding to have a name erased from the registration-book, that a complete answer to the showing that the voter had not been sworn as required by law would be made by a showing that the voter in fact possessed all of the qualifications which would entitle him to be registered.

· In *State* v. *Lattimore*, 120 N. C. 426,[1] it was held that where an elector's name appeared on the registration-book, he had a right to vote, whether he had been sworn prior to registration as required by law or not.

. In *Tullos* v. *Lane*, 45 La. Ann. 333, it was held that where the registration had been carried on under verbal authority from the registrar by persons not having legal authority so to do, voters actually entitled to vote could not after an election be deprived of their constitutional right to have participated therein, by the simple fact of itself that the person who registered them was not legally authorized so to do. (See, also, McCrary on Elections, 4th ed., sec. 140.)

No case has been cited, and I have been unable to find any, where a person who was in fact entitled to vote if registered, and whose name was enrolled on the register, and who was allowed to vote, has been held after the election to have been an illegal voter, simply for the reason that there was some irregularity or informality in the method by which he was registered.

The majority opinion appears to concede that under the law as it stood prior to the amendments of 1899, a vote cast by such a person would have been a legal vote. I cannot see that there has been any material change made in this regard by such amendments.

Van Dyke, J., and Shaw, J., concurred in the dissenting opinion.

---

[1] 58 Am. St. Rep. 797.