16354

HORTON v. BARUCH ET AL.

(59 S. E. (2d) 545)

*Messrs. McKay & McKay,* of Columbia, *for Appellant,*

50

*Messrs. McLeod & Singletary,* of Columbia, *for respondent,*

*Messrs. McKay & McKay,* of Columbia, *for Appellant,*

May 9, 1950.

TAYLOR, Justice.

This appeal comes from an order of the Court of Common Pleas of Richland County affirming an award by the South Carolina Industrial Commission for death benefits under the South Carolina Workmen's Compensation Act,

Code 1942, § 7035-1 *et seq.,* to the widow and sole dependent of Herbert P. Horton.

The only question in this appeal is one of jurisdiction, and this will be solved by determining whether or not the deceased, Herbert P. Horton, was a resident of South Carolina at the time of his death.

> "The circuit court, and this court, on the appeal of either party to the proceeding, has both the power and the duty to consider all the evidence in the record, and find therefrom the jurisdictional facts, without regard to the finding of such facts by the Commission." *Watson v. Wannamaker & Wells,* 212 S. C. 506, 48 S. E. (2d) 447, 448, citing *Tedars v. Savannah River Veneer Co.,* 202 S. C. 363, 25 S. E. (2d) 235, 147 A. L. R. 914; *Knight v. Shepherd,* 191 S. C. 452, 4 S. E. (2d) 906; *McDowell v. Stilley Plywood Co.,* 210 S. C. 173, 41 S. E. (2d) 872.

There is evidence to the effect that Herbert P. Horton, a then recently discharged veteran of the Army Air Force with the rank of Colonel, came to Georgetown, South Carolina, in 1946 for the purpose of securing employment as pilot of the private plane of Miss Belle W. Baruch, which was to be based at her plantation near Georgetown, South Carolina. Colonel Horton returned to Georgetown again approximately March 1, 1946, for the purpose of inspecting the "Gate Cottage" on this plantation, the occupancy of which was being considered as part of his compensation for the contemplated employment. As a result of these interviews, he was employed for this position and was to receive, in addition to the occupancy of the "Gate Cottage", the sum of $600.00 per month. This employment became effective March 1, 1946, and was confirmed by a telegram from Miss Baruch to Mr. Horton in Washington, D. C. He was then instructed by Miss Baruch to proceed to New York where he was about her business for several weeks when he was then directed by her to proceed to Wichita, Kansas, for the purpose of accepting delivery of an airplane which she had previously purchased from the Beech Aircraft Corporation.

After arriving in Wichita and making several preliminary flights, he was instructed to fly the plane to Wilmington, Delaware, where certain radio equipment was to be installed. On April 7, 1946, while in the act of carrying out these instructions, the plane crashed on the take off and Mr. Horton died immediately. Miss Baruch, as the employer, filed the required report of accident form with the South Carolina Industrial Commission and this is included as an exhibit in the case and states that Colonel Horton's residence was the same as her own, namely, Belleview Plantation, Georgetown, South Carolina.

The following testimony of the employer, Miss Belle Baruch, is of some significance:

"Mr. McLeod: Miss Baruch, state whether or not as a part of this contract of employment you had provided living quarters for the deceased on your estate here in Georgetown County? A. Yes, I had.

"Q. What quarters were they? A. My gate cottage.

"Q. State whether or not he looked over and inspected and accepted those quarters as his place in which he would live while in your employ? A. Yes.

"Q. State whether or not he made any arrangement about furniture to be placed in there? A. Yes, sir.

"Q. If you know, will you state whether or not he had—

"Mr. McKay: We object to this line of questioning on the grounds of irrelevancy unless Mr. McLeod ties it in with later testimony.

"Mr. McLeod: I think all of these facts have to do with the findings of residency. State whether or not it was planned that his wife, Mrs. Horton, the claimant, was to join him, and live down here in Georgetown County?

"A. That was my understanding.

"Q. What mission was Mr. Horton on at the time he was killed? A. He was taking off to go to Wilmington, Delaware, and have the radio equipment installed.

"Q. In your plane? A. Yes, sir.

"Q. And what were your instructions for him after he had the radio gear installed? What was he to do under your instructions? A. To come back here as soon as the ship was properly equipped.

"Q. And was it your understanding that he would be stationed here as long as he was in your employ? That this would be the base of operations? A. I believe so.

"Q. Miss Baruch, from the facts that you have testified to, and from your other knowledge in the matter, did you, at the time he was killed, regard him as a resident on your place here in Georgetown County?

"Mr. McKay: We object to that question.

"The Court: Objection noted. Go ahead and answer the question.

"A. I would have considered him as such, yes.

"Mr. McLeod: Did you, in fact, consider him as such when submitting your report, and showed his address as being the same as yours? Is that correct?

"A. Yes, sir."

Mr. Frank H. Horton, brother of the deceased, testified that in 1945, the deceased and Mrs. Horton were living in Del Ray, Florida, where he was stationed at that time in military service, and that, at the time of his death, Mrs. Horton was temporarily living with her father in the state of Massachusetts.

Section 7035-39, South Carolina Code 1942, provides: "Where an accident happens while the employee is employed elsewhere than in this State which would entitle him or his dependents to compensation if it had happened in this State, the employee or his dependents shall be entitled to compensation, if the contract of employment was made in this State, if the employer's place of business is in this State, and *if the residence of the employee is in this State;* provided his contract of employment was not expressly for service exclusively outside of the State   *   *   *."

Construing the foregoing section, it will be seen that there are four prerequisites to the South Carolina Industrial Com-

mission's having jurisdiction: 1. The contract of employment must be made in this State; 2. The employer's place of business must be in this State; 3. The residence of the employee must be in this State; 4. The contract of employment must be for services to be performed not exclusively outside of this State. *Price v. Horton Motor Lines*, 201 S. C. 484, 23 S. E. (2d) 744. It is conceded that three of the requirements have been complied with and that we are concerned in this appeal only with the question of residence.

Webster's Dictionary, Fifth Edition, defines "residence" as "* * * Act or fact of living in some place in the discharge of a duty or as a qualification, as to be in residence; the place where one actually has his home. * * *." Black's Law Dictionary, Third Edition, gives the term "residence" this meaning: one's house or dwelling." Also see Vol. 37 Words and Phrases, Perm. Ed., p. 248.

In the case of *Barfield v. J. L. Coke & Company*, 73 S. C. 181, 53 S. E. 170, it is stated: "The question of a person's place of residence depends upon his intention, as evidenced by his acts and declarations."

In *Swaney v. Hutchins*, 13 Neb. 266, 13 N. W. 282, 283, the following language is used: "The test of residence when a party removes from one state to another, seems to be: Did he remove from his former residence with the intention of abandoning the same? If he did so leave, and in pursuance of that intention actually went beyond the borders of the state, he will become a non-resident of that state, and upon going into another state with the intention of residing there, he will become resident thereof."

As far back as 1842, our own Court in *Bradley v. Lowry*, Speers, Eq. 1, 17 S. C. Equity 1, 39 Am. Dec. 142, reasoned: "But was there any residence in Alabama? The testator came to that State in the fall, and remained until May, when he died. It is true he did not buy a plantation, and settle upon it. Neither did he open a house of his own. He put his negroes to a particular employment, or hired them

out; and in May we find him boarding in the house where he died. But, says the learned judge, in the case of *Guier v. O'Daniel* [1 Bin., Pa., 349] already quoted, on a question of domicil, the mode of living is not material; whether on rent, at lodgings, or in the house of a friend. The apparent or avowed intention of constant residence, not the manner of it, constitutes the domicil. It is not, says he, by any particular act, that a domicil, generally speaking, is acquired; but by a train of conduct, manifesting that the country in which he died was the place of his choice, and to all appearance, of his intended residence."

There can be no question but what the deceased had abandoned such residence as he formerly had, seeking employment and a means of livelihood for himself and his wife. He had found such with Miss Baruch at the Belleview Plantation and had accepted as part of his compensation for his employment the occupancy of the "Gate Cottage", and it was his to all intents and purposes as though he had signed a rental contract thereon. His intention of living there seems to be beyond question, but he was prevented from spending a single night there because of the lack of furniture and his being sent temporarily away by his employer in the furtherance of her affairs.

In *Phillips v. South Carolina Tax Commission,* 195 S. C. 472, 12 S. E. (2d) 13, 15, this Court, considering the term "residence" in connection with the payment of state income tax, stated: "Manifestly the word 'residence' is a general term susceptible of varying interpretations. Its precise meaning is dependent upon the explanatory context; and with reference to statutory enactments would be governed by the legislative intent or purpose. But since the word might be literally construed to mean living in the State temporarily or transitorily as well as permanently obviously it should be given some definite construction, having in mind a fair and impartial imposition of the income tax burden; which was doubtless the legislative intention.

In discussing the meaning of the word "residence", it is stated in 54 Corpus Juris, 708-709: "Residence is the favorite term employed in statutes to express the connection between person and place. The meaning when employed in a statute is often provocative of dispute, often making it difficult to give an exact definition of what is meant by 'residence' as used in particular statutes, for when used in statutes it has different meanings in different connections, and may be used with different meanings in different statutes; and also, it sometimes has different shades of meaning in the statutes and even in the constitution. An examination of the authorities discloses that it has received different definitions in various cases, principally involving franchise, taxation, and jurisdiction. As its statutory definition depends upon the legislative purpose as well as the context of the statute, it must be construed in every case in accordance with the object and intent of the statute in which it occurs; hence its meaning is to be determined from the facts and circumstances taken together in each particular case. * * *"

In *Huston v. Anderson,* 145 Cal. 320, 78 P. 626, 635, we find that: "Every person has, in law, a residence and a residence cannot be lost until another is gained."

When the facts of this case are considered in the light of the foregoing and the pronouncement that this Court is committed to the proposition that the basic purpose of the Workmen's Compensation Act is the inclusion of employers and employees and not their exclusion, and that the doubts of jurisdiction must be resolved in favor of inclusion rather than exclusion, *Yeomans v. Anheuser-Busch, Inc.,* 198 S. C. 65, 15 S. E. (2d) 833, 136 A. L. R. 894, we are of the opinion that the deceased at the time of his death was a resident of South Carolina within the contemplation of the Workmen's Compensation Act and that the order appealed from should be affirmed, and it is so ordered.

FISHBURNE, STUKES, and OXNER, JJ., and L. D. LIDE, A. A. J., concur.

BAKER, C. J., not participating.