[Crim. No. 560. Third Appellate District.—August 26, 1921.]

## THE PEOPLE, Respondent, v. JOHN ENGLISH, Appellant.

[1] CRIMINAL LAW—ILLEGAL VOTING—RESIDENCE OF VOTER PERSONATED—EVIDENCE—VERDICT.—In . this prosecution of a defendant, who was entitled to vote at a primary election in a given precinct, for the crime of personating another who, it was alleged in the indictment, was likewise entitled to vote at that election in that precinct, the evidence, tested by the rules of law prescribed by sections 52 and 1239 of the Political Code, was legally sufficient to justify the conclusion of the jury that the latter was a resident and entitled to vote at that election in that precinct, even though he had therein no room or house in which to dwell, and was sufficient to support its verdict that the defendant was guilty.

APPEAL from a judgment of the Superior Court of Sacramento County. H. D. Burroughs, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

S. Luke Howe and Sheridan Downey for Appellant.

U. S. Webb, Attorney-General, and J. Chas. Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant, himself a duly qualified elector and entitled to vote in precinct No. 83 of Sacramento County, was indicted by the grand jury of said county for the crime of voting at the general primary election held throughout the state on the thirty-first day of August, 1920, in said precinct No. 83 of said county, upon the false and fraudulent representation that he was one John Henry Miller, who, the indictment alleges, was "a duly qualified

elector of the county of Sacramento'' at the time of said
election, ''and then and there duly and legally qualified
and entitled to vote as such elector at said election at
August primary'' in said precinct No. 83 of said county.

A trial of the accused resulted in his conviction by the
jury of the offense so charged, and he prosecutes this
appeal from the judgment and the order denying his mo-
tion for a new trial.

The indictment was based on section 46 of the Penal
Code, which is as follows: ''Every person not entitled to
vote, who fraudulently attempts to vote, or who, being en-
titled to vote, attempts to vote more than once at any
election, or who personates, or attempts to personate, a
person legally entitled to vote, is punishable by imprison-
ment in the state prison for not less than one nor more
than two years.''

It will be noted that by the foregoing section three dif-
ferent offenses against the elective franchise are described
or defined, the indictment being founded upon the last
part of the section, whereby it is made a crime for one,
himself being entitled to vote at an election, who per-
sonates, or attempts to personate, a person legally en-
titled to vote. Under the indictment upon which the
defendant was tried and convicted it was, to justify a con-
viction, essential for the people to establish by the requisite
degree of proof these facts or elements: 1. That the defend-
ant himself was under the law entitled to vote at the
primary election referred to in the indictment; 2. That the
said John H. Miller was likewise entitled to vote at said
election; 3. That the defendant voted at said primary elec-
tion under the name of John Henry Miller and upon the
false representation that he was said person.

No question is raised here of the sufficiency of the proof
to support the finding of the jury, as implied from the
verdict, that the defendant himself was legally entitled to
vote and that he represented himself to be and did vote at
said primary election as ''John Henry Miller.'' Nor is it
questioned that a person named John Henry Miller was
registered as a voter in precinct No. 83 of Sacramento
County and that he did not himself vote at the primary
election in question. It is contended, however, that the
evidence is wholly insufficient to show that said John Henry

Miller was legally entitled to vote in said precinct at the time of the holding of the primary election in said county of Sacramento on the thirty-first day of August, 1920, and this point constitutes the sole ground of complaint against the legal integrity of the verdict.

The rules of law in this state by which the question of residence is to be determined are set forth in sections 52 and 1239 of the Political Code. The section first named, among other things, declares:

"Every person has, in law, a residence. In determining the place of residence the following rules are to be observed:

"1. It is the place where one remains when not called elsewhere for labor or other special or temporary purpose, and to which he returns in seasons of repose;

"2. There can only be one residence;

"3. A residence cannot be lost until another is gained; . . ."

Section 1239 of the same code, which is under the title and chapter of said code relating to "voting and challenges" at elections, provides, in part, as follows:

"The board of election, in determining the place of residence of any person, must be governed by the following rules, as far as they are applicable:

"1. That place must be considered and held to be the residence of a person in which. his habitation is fixed, and to which, whenever he is absent, he has the intention of returning; . . .

"3. A person must not be considered to have lost his residence who leaves his home to go into another state, or precinct in this state, for temporary purposes merely, with the intention of returning;

"4. A person must not be considered to have gained a residence in any precinct into which he comes for temporary purposes merely, without the intention of making such precinct his home; . . .

"10. The mere intention to acquire a new residence, without the fact of removal, avails nothing, neither does the fact of removal, without the intention." (See Stats. 1917, pp. 416, 417.)

[1] The question here is whether the record discloses evidence which, when tested by the rules above stated

herein, is such as to preclude us from justly declaring that the fact that said Miller was a resident and entitled to vote in said precinct No. 83, at the time of the primary election mentioned, was sufficiently established, the existence of the other elements of the crime charged being, as seen, conceded.

It was shown that the John Henry Miller named in the indictment was a laboring man and had lived at a hotel owned and conducted by a Mrs. Mary McIsaac, at 1401 Front Street, in Sacramento City, for about seventeen years down to the fifteenth day of June, 1921. Said Miller was a registered voter from said hotel, and had at a number of elections voted in the election precinct in which the hotel was situated. Miller would often, during the years he resided at said hotel, leave Sacramento to work for others, but, upon finishing the work for the performance of which he had been employed, would return to Sacramento and to the said hotel, where he resided and would remain until any work he might obtain would again require him to leave the city. For several months he was employed by Mrs. McIsaac about the hotel. He was thus employed down to the fifteenth day of June, 1920. Mrs. McIsaac, testifying for the people, stated that Miller was at times "nervous and unstrung," and when in that state would quit working for her. She said that, on the fifteenth day of June, 1920, Miller ceased working for her, and she paid him in full what she owed him; that Miller, having been at some time previously operated upon to correct some physical ailment, stated to her on the day just named that it was necessary for him to submit to another such operation and that he was going to a hospital in Sacramento that day for that purpose; that she then said to Miller that she was tired of his presence at the hotel, that, as both were of a nervous disposition and could not get along together, it was her desire that he would not return to her place, or words to that effect, and that Miller, replying to that suggestion, said that he intended, after he was operated upon and discharged from the hospital, to go to Oakland, where he would remain with his brother, who resided in that city, until his health was restored. Continuing, Mrs. McIsaac stated that she assisted in getting Miller to the hospital, but that he remained at the institution only a few

hours, leaving for the purpose of taking work "up the river"; that she would say, so far as she was able to recollect, that Miller never stopped at or slept in her house after June 15, 1920, although she did say that, after that date, he left with her for safekeeping some money he had earned in his more recent employment. On redirect examination the witness testified: "Q. Isn't it a fact that the man, John Henry Miller, was in the habit of going out into the country and returning to your place, making that as his home? A. Well, I know he would work on the boats, then he would come back and ask me if I had any place for him, but he never asked me to keep a room for him. Q. Oh, I understand that, but it was his custom, during the seventeen years, when he came to Sacramento to make your place his residence; wasn't that it? A. Well, yes. Q. That is correct, isn't it, Mrs. McIsaac? A. Yes, sir. Q. And when he left, in June, and went to the hospital, and then he came back to your place, didn't he? A. Yes. Q. Did he stay there, at all? A. No, he did not. He went to the country,—no. Q. Well, you told Mr. Howe that he left and went to the hospital and didn't stay there, and came back to your place. A. He went to the hospital, yes,—oh, yes. My son-in-law took him out, made arrangements with the sisters at the Sister's Hospital, and was going,—now, whether he paid the bill or not, I don't know; but he went and bought two nightshirts; and went out there and made arrangements, and when I came back in the morning he was up there. Q. Up in your house? A. Yes. He came in, and I said: 'Miller, you can't stay here.' "

John H. Miller was called by the defendant and, testifying as to his residence at 1401 Front Street, stated that he left the hotel of Mrs. McIsaac on the fifteenth day of June, 1920, for the purpose of going to the Sisters' Hospital in Sacramento for an operation; that he remained there but a few hours, when he returned to Mrs. McIsaac's place; that Mrs. McIsaac said to him that he could not live at her hotel any longer, and he thereafter secured a position as a watchman on the steamer "Flora," plying the Sacramento River and which was moored at a station known as Vernon, a number of miles north of Sacramento on the Sacramento River. He testified that upon taking

the position as watchman on the steamer "Flora," he considered that his residence was on the boat. When asked what he meant by residence, he replied that it was the place where he ate his meals and slept. He said that he left the McIsaac hotel with the intention of not returning to the city of Sacramento and taking up his residence; that he intended to go to Oakland and reside. He testified on cross-examination that for the past seventeen years he had frequently worked on the boats on the Sacramento River and that "every time that I finished I would come back to 1401 Front Street"; that he was registered as a voter from 1401 Front Street (the McIsaac Hotel), and that he had on several occasions voted at elections from that place. He likewise testified that when he left the Sisters' Hospital on the fifteenth day of June he returned to the McIsaac hotel and remained there several days, or until he went to Vernon to take the position on the steamer "Flora" as a watchman; that after he ceased working on the steamer he went to the Holland land district, which is on an island south of the city of Sacramento; that he got sick while there and was for that reason unable to work longer, and came back to Sacramento in the month of July, 1920; that he slept "uptown, but I guess some nights I slept in the corner," referring, as he later explained, to the McIsaac place; that after he recovered from his illness he again went to Vernon and resumed work as a watchman on the steamer "Flora" and remained there until he came to Sacramento; that he shortly thereafter went over to the Yolo County side of the Sacramento River, where the boat was "tied up," and worked there as a watchman on the boat until the 17th of September. He further stated that he had not gone to Oakland after the 15th of June, that he had no residence there and that he had no residence in Yolo County, other than living on the boat while engaged in his work as watchman. He testified that he had known the defendant about thirty-five years and knew him while he stopped at the McIsaac place.

The foregoing brief recapitulation of the evidence is sufficient to show that, tested by the rules of law (above stated herein) whereby the matter of residence is to be determined, the case as made by the proofs is such that the question whether the said Miller was, on the thirty-

first day of August, 1920, the time of the holding of the primary election at which the defendant is charged with having voted upon the false representation that he was said Miller, entitled to vote as a registered voter of precinct No. 83 of said county, was one for decision by the jury; and, the jury having accepted the testimony as being sufficient to establish in their minds the truth of that element of the crime charged beyond a reasonable doubt, we are not prepared to say that the conclusion so arrived at was not justified. We can say, however, that, upon its face, the testimony is sufficient to support the verdict.

There is nothing in the evidence to show that the witness Miller ever changed or abandoned his residence at the McIsaac hotel or that he attempted to establish a residence at any other place or intended to do so. It is true that he stated that he left the McIsaac hotel with the intention of abandoning it as his place of residence, and it is also true that he stated that, after leaving said hotel on the 15th of June, 1920, to work on the steamer "Flora" at Vernon, his residence was on said steamer. The latter statement involved a legal conclusion, and as so made by the witness it was shown to be wholly without probative force upon that question by his explanation that he considered the place where he took his meals and slept sufficient to constitute a legal residence. As to his statement that he took his leave from said hotel with the intention of not returning thereto, it is clear that, under the law, such intention, even if it were in his mind, was not of itself sufficient to constitute an abandonment of said place as his residence or to effect any such result. As we have seen, under the law, every person has a residence (Pol. Code, sec. 52), and "that the mere intention to acquire a new residence, without the fact of removal," cannot have the effect of changing a person's residence from the place where he has established it to some other place. (Pol. Code, sec. 1239.) There is no evidence that he registered at any other voting precinct, and such evidence would readily have been available in documentary form had it existed, because the records of the registration office would have shown that his registration as a voter in precinct No. 83 of Sacramento County had been canceled. Indeed, the affidavit of registration of Miller, which was in-

troduced and received in evidence in this case, constituted some evidence of the fact that he was not registered as a voter in any other precinct or' county, otherwise said affidavit would probably not have been in existence. It is clear that said precinct No. 83 at the time of the holding of said primary election was his residence, even though he had therein no room or house in which to dwell. In *Huston* v. *Anderson,* 145 Cal. 320, 328, [78 Pac. 626, 635], which involved an election contest and in which an objection was raised to the right of a certain person who had voted at the election to vote, said person having previously to the election moved to another precinct to undertake temporary employment only, the court said, referring to said objection: "The evidence was sufficient to sustain a conclusion that he had no intention of making the precinct into which he moved his residence. . . . If the voter had no intention of making the precinct into which he moved his home, but went there for temporary purposes only, he did not gain a residence there, and consequently did not lose his legal residence in the precinct from which he moved, *notwithstanding that he may not have had any certain house, room, or place therein that he could call his home.* (Italics ours.) That precinct continued to be his legal residence until he gained a legal residence elsewhere. The evidence was such that it might have sustained a contrary finding, but not such as to warrant us in disturbing the finding of the court below. (See, in this connection, *Smith* v. *Thomas,* 121 Cal. 533, [51 Pac. 71]; *Stewart* v. *Kyser,* 105 Cal. 459, [39 Pac. 19].)" (See, also, *Sheehan* v. *Scott,* 145 Cal. 684, [79 Pac. 350].)

What is said in the above case is cogently pertinent to the case here, although we are not prepared to say that the evidence, taking it at its face value, would have warranted the jury in reaching any other conclusion than that evidenced by their verdict. Our conclusion is that the verdict is amply supported by the evidence and, accordingly, the judgment and the order appealed from are affirmed.

Burnett, J., and Finch, P. J., concurred.