[S.F. No. 25130. Apr. 28, 1988.]

NORMAN A. WALTERS et al., Plaintiffs and Appellants, v.
JANE WEED et al., Defendants and Appellants.

COUNSEL

Ronald A. Zumbrun, Anthony T. Caso, Jonathan M. Coupal, John H. Findley, Timothy J. Morgan and Liberty, Morgan & Glidden for Plaintiffs and Appellants.

Gary M. Cohen, John W. Keker, Keker & Brockett, Mitchell Page, Page & Coben and Robert E. Taren for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Marian M. Johnston and Manuel M. Madeiros, Deputy Attorneys General as Amici Curiae on behalf of Defendants and Appellants.

## OPINION

**PANELLI, J.**—This case presents the question whether voters who leave their domiciles with no intention of returning to live there lose their right to vote in their former domiciles even though they have not yet established new domiciles. In light of the principle that everyone must have a domicile somewhere, we conclude that such individuals retain their right to vote in the precincts of their former domiciles.[1]

### FACTS

On November 8, 1983, Jane Weed and three other candidates were elected to the Santa Cruz City Council. Ms. Weed received the fewest number of votes of the four declared winners. Based on a Santa Cruz County Grand Jury report that found voting irregularities in the four on-campus precincts at the University of California, Santa Cruz (UC Santa Cruz), plaintiffs, a group of individual citizens, contested Weed's election. They alleged that 472 of the persons who voted in the on-campus precincts were not domiciled in the precincts in which they voted and thus cast illegal votes. Plaintiffs filed a statement of contest of election, seeking a declaration that candidate Bill Fieberling, who lost to Weed by 145 votes, be declared the rightful winner.

At the time of the election in 1983 the 472 voters in question were students at UC Santa Cruz. They had lived and registered to vote on the university campus. When they returned to school in the autumn of 1983, many were unable or chose not to live on campus. However, by the time voter registration closed, not all of these students had obtained off-campus housing where they intended to remain. As a result, they voted in their former campus precincts. The question therefore presented is whether these students lost their right to vote on campus during the period between the date on which they abandoned their campus domiciles with no intention of returning there to live and the date on which they established new domiciles. For the reasons set forth below, we hold that these students did not vote illegally. We therefore uphold the election results.

### PROCEDURES BELOW

This case involved a lengthy trial, at which 292 voters testified. To avoid the intrusive, time-consuming process of requiring the students to disclose

[1] Strictly for purposes of clarity, we refer in this opinion to a person's physically abandoned home as his or her "former" domicile, even though we hold in this case that the former precinct remains the "current" domicile for voting purposes until a new domicile is acquired. We do this in an effort to distinguish the "former" domicile from the person's current temporary residence and future domicile.

the tenor of their votes (Evid. Code, § 1050), the trial court approved the parties' stipulation to the use of a formula which permitted the court to find that for every ten illegal votes found within the four on-campus precincts, nine were to be counted for Weed and one for Fieberling. The nine-to-one formula was based on the trial court's taking judicial notice of the political profile of UC Santa Cruz students: "[A] candidate or issue that appeals to the left side of the spectrum and prevails or fails narrowly in Santa Cruz as a whole carries the campus by 88 to 96 percent of the votes cast. . . ."[2] The use of this type of formula has been approved in prior decisions (see, e.g., *Singletary* v. *Kelley* (1966) 242 Cal.App.2d 611 [51 Cal.Rptr. 682]) and is not at issue here. By a computation similarly not at issue, the trial court determined that under the nine-to-one formula, one hundred eighty-two illegal votes citywide were necessary to set aside the election results, as permitted by section 20024 of the Elections Code,[3] and declare Fieberling the winner.

The court found that 193 voters who testified did not physically reside in the on-campus precincts in which they voted and "unequivocally" expressed at trial the intention not to return to live on campus. Of these 193 voters, the trial court found that only 113 had acquired a new domicile as of 1 month before the election and had therefore voted illegally.[4] As to the remaining 80 voters, the trial court affirmed the legality of their votes based on the principle, codified in section 244 of the Government Code, that one cannot lose a domicile until a new one is acquired. The trial court found that only 113, rather than the necessary 182, votes had been cast illegally and confirmed Weed's election.

[2] According to the trial court, defendant Weed and candidate Mike Rotkin were the two "progressives" among the top four candidates; the other winning candidates, Arnold Levine and Katy Sears-Williams, were "moderates."

Candidate Bill Fieberling, a moderate, actually received the sixth highest number of votes, 107 votes behind Bruce Van Allen, a progressive. The trial court determined that Van Allen had "no stake in this case even though he garnered more votes than Fieberling. Judged by the [nine-to-one] yardstick adopted by the court, Van Allen received precisely as many illegal votes as did Weed."

[3] Section 20024 of the Elections Code provides: "An election shall not be set aside on account of illegal votes, unless it appears that a number of illegal votes has been given to the person whose right to the office is contested or who has been certified as having tied for first place, which, if taken from him, would reduce the number of his legal votes below the number of votes given to some other person for the same office, after deducting therefrom the illegal votes which may be shown to have been given to that other person."

[4] The trial court divided the students into the following groups: "1. Persons who are likely to return to the campus to live. . . . [¶] 2. Persons who had evinced an intention not to establish a post-campus domicile and whose testimony on that point was credible. . . . [¶] 3. Persons whose life circumstances showed an intention not to consider their post-campus residence at the relevant time as their domicile. . . . [¶] 4. People who have no place to roost except at the University. . . . [¶] 5. People whose testimony did not persuade me that they clearly should have voted in a different precinct. . . . [¶] 6. People who, as of October 11, 1983, had a domicile in a precinct other than the one in which they voted."

The trial court found that only those 113 persons in the last category voted illegally.

The Court of Appeal reversed, declaring Fieberling the winner in place of Weed. The Court of Appeal hinged its analysis on section 200, subdivision (b) of the Elections Code which provides that one's domicile for voting purposes is "that place in which his or her habitation is fixed, wherein the person has the intention of remaining, and to which, whenever he or she is absent, the person has the intention of returning. . . ." Thus, the court held that, as a matter of law, the 193 persons who moved from their campus domiciles without the intention of returning there to live lost the right to vote in those precincts, *regardless of whether they had established new domiciles.*[5] The effect of the court's decision was to disenfranchise those voters who abandoned a former domicile without having established a new one. We granted Weed's petition for review to reconcile the apparent conflict between the Government Code provisions relied on by the trial court and the Elections Code provisions relied on by the Court of Appeal.

DISCUSSION

A. *Elections Code Section 200.*

The California Constitution provides that "[a] United States citizen 18 years of age and resident in this state may vote" and directs the Legislature to "define resident and provide for registration and free elections." (Cal. Const., art. II, §§ 2, 3.) To comply with this constitutional mandate, the Legislature enacted sections 200-217 of the Elections Code, setting forth the criteria to determine one's residence for voting purposes.

Section 200 of the Elections Code provides: "(a) Except as provided in this article, the term 'residence' as used in this code for voting purposes means a person's domicile. [¶] (b) The domicile of a person is that place in which his or her habitation is fixed, wherein the person has the intention of remaining, and to which, whenever he or she is absent, the person has the intention of returning. *At a given time, a person may only have one domicile.* [¶] (c) The residence of a person, as used in this article, is that place in which the person's habitation is fixed for some period of time, but wherein he or she does not have the intention of remaining. *At a given time, a person may have more than one residence.*" (Italics added.)

Plaintiffs contend that the definition of domicile set forth in section 200, subdivision (b) demonstrates that the Court of Appeal was correct in

---

[5] The Court of Appeal explicitly did not determine where the 193 students should have voted: "[T]hose 193 voters voted in a precinct in which they had no fixed habitation, and to which they had no intention to return. We cannot on this record decide where else each of these individuals could or should have registered to vote. We hold only that each had lost his or her campus precinct voting domicile and therefore voted illegally in that precinct in the election at issue."

invalidating the 193 votes cast by students who voted on campus after having relocated with no intention to return to campus to live. Indeed, as aptly stated by the trial court, "If section 200 were the only statute on point, this case would be very easy to decide. The overwhelming majority of voters, far more than necessary to overturn the election, testified unequivocally that when they moved [off campus], they had formed the clear resolve not to return to the campus to live. Those students could not have more clearly renounced the ambit of section 200[, subdivision] (b)." The trial court correctly recognized, however, that section 200 of the Elections Code is not the only statute to be considered; sections 202, subdivision (b) and 205 of the Elections Code and sections 243 and 244 of the Government Code must also be taken into account.

B. *Elections Code Sections 202, Subdivision (b) and 205; Government Code Sections 243 and 244.*

Section 202, subdivision (b) of the Elections Code provides: "A person does not gain a domicile in any precinct into which he or she comes for temporary purposes merely, without the intention of making that precinct his or her home." Section 205 of the Elections Code provides: "The mere intention to acquire a new domicile, without the fact of removal avails nothing, neither does the fact of removal without the intention." Additionally, sections 243 and 244 of the Government Code set forth rules for determining one's "domicile"—a term referred to in those sections alternately as one's "legal residence" or "residence." Section 243 of the Government Code provides: "Every person has, in law, a residence." Section 244 establishes: "In determining the place of residence, the following rules shall be observed: . . . [¶] (b) There can only be one residence. [¶] (c) A residence cannot be lost until another is gained. . . . [¶] (f) The residence can be changed only by the union of act and intent." ■ We have recognized that these Government Code sections which use the term "residence" actually mean *"legal* residence" or "domicile," and we have interpreted them accordingly. (*Smith* v. *Smith* (1955) 45 Cal.2d 235, 239 [288 P.2d 497]; accord *Fenton* v. *Board of Directors* (1984) 156 Cal.App.3d 1107, 1113-1114 [203 Cal.Rptr. 388].)

■ Sections 202, subdivision (b) and 205 of the Elections Code and sections 243 and 244 of the Government Code rest on the well established principle that every person has in law a domicile or, as stated in the vernacular by the trial court, "everybody belongs somewhere." To insure that everyone has a domicile at any given time, the statutes adopt the rule that a domicile is not lost until a new one is acquired. These fundamental principles are supported by a long and diverse line of authority. (See, e.g., *Mitchell* v. *U.S.* (1875) 88 U.S. (21 Wall) 350, 353 [22 L.Ed. 584, 588]; *Sampsell*

v. *Superior Court* (1948) 32 Cal.2d 763, 774 [197 P.2d 739]; *Smith* v. *Smith* (1955) 45 Cal.2d 235, 239 [288 P.2d 497]; *Estate of Glassford* (1952) 114 Cal.App.2d 181, 186 [249 P.2d 908, 34 A.L.R.2d 1259]; *Chapman* v. *Superior Court* (1958) 162 Cal.App.2d 421, 426-427 [328 P.2d 23]; *In re Leff* (1972) 25 Cal.App.3d 630, 642 [102 Cal.Rptr. 195]; Rest.2d Conf. of Laws, § 19; 1 Beale, A Treatise on the Conflict of Laws (1935) ch. 2, pp. 181-182.)

The few California decisions that have addressed the specific question of what constitutes one's domicile for voting purposes have affirmed the fundamental principles set forth above. (*Huston* v. *Anderson* (1904) 145 Cal. 320, 328-329 [78 P. 626]; *People* v. *English* (1921) 54 Cal.App. 90 [201 P. 145]; see also *Collier* v. *Menzel* (1985) 176 Cal.App.3d 24 [221 Cal.Rptr. 110].)

C. *The Gap in the Statutory Scheme.*

Given the principle that everyone must have a domicile somewhere, a gap appears to exist in the statutory scheme. On the one hand, section 200, subdivision (b) declares that in order to establish one's domicile, one must have a fixed habitation, the intent to remain and, when absent, the intent to return. On the other hand, the remaining statutes in the scheme comprise a legislative mandate that everyone be domiciled somewhere and that the act of leaving one's domicile without the act and intention of establishing a new one does not extinguish the old. "These statutes," the trial court cogently observed, "do not mesh."

The trial court posed a simple hypothetical to illustrate the gap in the statutory scheme: "What of a person who has departed a residence with the unequivocally expressed intention not to return but who views his new abode as a temporary stopping place and does not intend it to be his domicile?" Under section 200, subdivision (b), the person is arguably left without a domicile, no longer entitled to vote in the precinct of the abandoned residence. Under sections 202, subdivision (b) and 205 of the Elections Code and sections 243 and 244 of the Government Code, the person retains the abandoned residence as his or her domicile for voting purposes until such time as a new one is acquired. The hypothetical is not an idle one but rather, according to the trial court, applies to the particular situation described by "many, if not most" of the witnesses in this case.

D. *Reconciliation.*

 Confronted with statutes that appear to be at odds with each other, as illustrated by the hypothetical, the trial court endeavored to reconcile the statutes by gleaning from them the following rule: "Even if a voter has left his residence with the intention not to return to it, that residence remains

his domicile as long as he has not acquired a new one." The trial court's rule, in our view, properly harmonizes the relevant statutes and merits our adoption.

█ In examining statutes that appear to conflict, we are guided by settled rules of statutory construction. The most fundamental of these rules is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*Brown* v. *Superior Court* (1984) 37 Cal.3d 477, 484 [208 Cal.Rptr. 724, 691 P.2d 272].) Statutes that are apparently in conflict should, if reasonably possible, be reconciled (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 596 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]), even when the court interprets provisions in different codes (*Building Material & Construction Teamsters' Union* v. *Farrell* (1986) 41 Cal.3d 651, 665 [224 Cal.Rptr. 688, 715 P.2d 648]).

█ Sections 200-217 of the Elections Code represent the Legislature's response to numerous allegations of election fraud in the local elections held in San Francisco and San Bernardino in 1975. (Bolinger, Cal. Elec. Law During the Sixties and Seventies: Liberalization and Centralization, 28C West's Ann. Elec. Codes (1977 ed.) pp. 55, 83-86.) The allegations were based on reports that many city residents had moved to outlying areas with the intent to remain in the suburbs, but had returned to vote in their former city precincts. Among those who had migrated to the suburbs were a number of city employees of San Francisco "believed to be more than enough to determine the outcome of many elections, including measures involving pensions of city employees." (*Id.* at p. 84.)

Shortly after these allegations were published, Senate Bill No. 1653 was introduced, part of the four-bill package which was ultimately chaptered as sections 200-217 of the Elections Code. (Sen. Bill No. 1653 (1975-1976 Reg. Sess.).) In testifying before the Senate Committee on Elections and Reapportionment as to the purpose of Senate Bill No. 1653, the bill's author stated: "I'm sure you recognize the fact that a person can have more than one residence but a person cannot have more than one domicile and so [Senate Bill No. 1653] seeks to arrive at that particular point. . . . [The bill attempts] to set forth . . . in statutory form for the first time some of the court decisions on the question of domicile and residence . . . [so] the Clerks and the voters will know where people should vote. . . . [Senate Bill No. 1653] also defines what's meant by domicile and residence; a question of act and intent required to establish a domicile. . . ." (Transcript of Hg. on Voter Residency and Registration before Sen. Com. on Elec. and Reapportionment (Mar. 5, 1976) pp. 6-13.)

Plaintiffs argue that the legislative intent underlying sections 200-217 of the Elections Code was to prevent voters from casting ballots in the precincts of their abandoned domiciles. Plaintiffs are only partially correct. It is clear from the circumstances surrounding the adoption of sections 200-217, and from the statements made by the author of the bill, that the Legislature sought to prevent people who had in fact acquired *new domiciles* from voting in the precincts of their abandoned domiciles.

■ Although there is a marked judicial reticence to rely on statements made by individual members of the Legislature as an expression of the intent of the entire body (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 258 [104 Cal.Rptr. 761, 502 P.2d 1049]), the Senate committee hearing transcript, incorporating the author's testimony, commands respect for two reasons. First, we have in the past accepted an individual legislator's statement as an aid to ascertaining a statute's underlying purpose when the statement has given some indication of the arguments made to the Legislature and was subsequently printed by the Legislature. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 700 [170 Cal.Rptr. 817, 621 P.2d 856].) Second, the transcript reveals the discussion and events at the hearing, aspects which we may properly consider. (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 590 [128 Cal.Rptr. 427, 546 P.2d 1371]; *Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 603 [45 Cal.Rptr. 512].) That discussion, which comprised a full day's testimony, indicates that other legislators and witnesses shared the author's views on both the need for, and the purpose of, Senate Bill No. 1653.

■ We have recognized that a wide variety of factors may illuminate the legislative design, " 'such as context, the object in view, the evils to be remedied, the history of the time and of legislation upon the same subject, public policy and contemporaneous construction.' " (*In re Marriage of Bouquet, supra,* 16 Cal.3d 583, 587, quoting *Alford* v. *Pierno* (1972) 27 Cal.App.3d 682, 688 [104 Cal.Rptr. 110].) ■ The election fraud alleged in connection with the 1975 elections, and the references to that fraud during the consideration of Senate Bill No. 1653, suggest a legislative intent to clarify vague voter residency requirements, with the goal of preventing voters who had established new domiciles from voting in the precincts of their abandoned domiciles. Thus, sections 200-217 of the Elections Code were not drafted to address the specific problem raised by this case in which people left their domiciles but did not acquire new ones.

Additionally, we may presume that the Legislature was aware of prior judicial decisions that examined voter residency requirements. (*Buckley* v. *Chadwick* (1955) 45 Cal.2d 183, 193 [288 P.2d 12].) ■ Where the

Legislature uses terms already judicially construed, "the presumption is almost irresistible that it used them in the precise and technical sense which had been placed upon them by the courts. [Citations.]" (*City of Long Beach v. Marshall* (1938) 11 Cal.2d 609, 620 [82 P.2d 362].) This presumption is strengthened further by the author's statements at the committee hearing that the purpose of the bill was to bring the unclear statutory requirements into conformity with the court decisions that had defined domicile for voting purposes. The guidance provided by those decisions—*Huston* v. *Anderson, supra,* 145 Cal. 320 and *People* v. *English, supra,* 54 Cal.App. 90—aids considerably our task of reconciling section 200, subdivision (b) with the other relevant statutes. Those decisions have as their pole star the requirement that a domicile of choice cannot be created without the union of act and intent. Sections 202, subdivision (b) and 205 of the Elections Code and section 244 of the Government Code are similarly guided. Since we may presume that the Legislature did not intend to act inconsistently on the same subject (*Jacobs* v. *State Bd. of Optometry* (1978) 81 Cal.App.3d 1022, 1031 [147 Cal.Rptr. 225]), we agree with the trial court that section 200, subdivision (b) must be read in light of the other statutes to ensure that, for voting purposes, "everybody belongs somewhere."

 With this principle in mind, we return to the facts of the present case. It is undisputed that when the students whose votes are at issue registered to vote on campus, sometime before the autumn of 1983, they satisfied the three requirements of section 200, subdivision (b). Their habitation was fixed, they lacked the present intention to move elsewhere and, when absent, they viewed their campus accommodations as the place to which they intended to return. It is also without dispute that when these students returned to school in the autumn of 1983 and resided temporarily in the off-campus homes or apartments of friends, in cars parked in remote campus parking lots, or in tents pitched under the campus redwoods, they no longer satisfied the section 200, subdivision (b) requirements, because their habitation was not fixed, they intended to move elsewhere and, when absent, they did not necessarily view their temporary accommodations as the place to which they intended to return. Bearing in mind the principle that one can never be without a domicile, the question we must resolve is, "*Where* were these students domiciled for voting purposes when they resided at their temporary locations during the autumn of 1983?"

To answer the question, we have before us three alternatives: 1) the domiciles which the students would eventually establish, i.e., their "future domiciles"; 2) the location of the students' temporary residences (i.e., their residences on the last day of voter registration); or 3) the location of the

students' abandoned domiciles.[6] Alternative number one, the students' future domiciles, is inappropriate; unlike their counterparts whose votes the trial court invalidated, the students whose votes are at issue had not yet established new domiciles. Thus, many if not all of these students were obviously unable to identify the location of their future domiciles, and the law does not demand such prescience. Alternative number two, the students' temporary residences, is also inappropriate. Use of such residences for voting purposes would ignore the section 200, subdivision (b) requirements of a fixed habitation, the lack of a present intention to move elsewhere, and the intention, when absent, to return to the temporary accommodations. Moreover, allowing people who abandon their domiciles to vote in the precincts of their current temporary residences would create a system in which people could vote anywhere they chose, regardless of their ties to the community. Voters who abandon their domiciles could temporarily stay in precincts where their votes would have the greatest impact. We decline to allow such precinct shopping.[7]

Alternative three, the former domicile, presents the logical choice. It is the only location where the student had satisfied the requirements of section 200, subdivision (b). It is also consistent with the statutory principle that one's domicile is unaffected by one's relocation where that relocation is accomplished without the intent to make the new residence one's domicile. (Elec. Code, § 205.) Finally, it ensures the continued integrity of the legislative mandate codified in Government Code section 244 that no one can be without a domicile.

We agree with the dissent that the main concern here is forum (or precinct) shopping and that the legislative goal of the statutes in question was

---

[6] In England, a fourth alternative, dispositive of the issue presented here, exists. Under the English rule, a person's domicile of origin (i.e., domicile at birth) is revived during the period when the person is traveling from an abandoned domicile to a new domicile of choice. (See Rest.2d Conf. of Laws, § 19, reporter's notes, com. b, pp. 78-79.) The doctrine of revival has not been adopted in the United States. (*Ibid.*)

[7] The dissent's preference for alternative two is primarily based on an erroneous interpretation of *Jolicoeur* v. *Mihaly* (1971) 5 Cal.3d 565 [96 Cal.Rptr. 697, 488 P.2d 1]. In *Jolicoeur* we held that newly enfranchised voters between the ages of 18 and 21 had to be treated the same as adults for voting purposes, thus preventing local precincts from requiring young voters to register at their parents' domiciles. Although the dissent interprets *Jolicoeur* as further holding that a voter must be allowed to vote in the place of his or her residence regardless of whether that residence is permanent or temporary, a close reading of *Jolicoeur* shows that the young voters in that case claimed a domicile away from their parents. We expressly stated that "[t]he youth . . . claims his current residence as his domicile but would be disqualified solely, 'on account of age' " and that "[a]n unmarried minor must be subject to the same requirements in proving the location of his domicile as is any other voter." (*Id.* at p. 571.) Although in *Jolicoeur* we discussed the potential temporary status of voting-aged students, we did not hold that such temporary status should be ignored. Rather, we simply affirmed the legislative mandate that a young person's right to vote at his or her current residence should not be abridged solely because of the person's "student status." (*Id.* at pp. 576-577, 582.)

the deterrence of election fraud. However, we believe this concern is best met and the legislative objective best served by the rule we adopt today.

Under the dissent's approach, a voter would have an incentive to move into an area temporarily to attempt to establish a domicile for a given election. The dissent provides no limiting standards to control fraud; one who *claimed* to have left a prior domicile and had not established a new one would be allowed to vote wherever he or she happened to be at the time registration closed. Only by keeping an eye on each such voter after the election could it be determined if the claim had been fraudulent. Our approach offers the necessary standards to prevent such carpetbagging; it leaves a voter where he or she was unless and until a new domicile is established under standard principles. The decision to move cannot be made at the last minute for voting purposes alone. Our approach can be faulted at most for possibly not deterring a voter from returning to a former location to vote by falsely claiming not to have established a new domicile elsewhere. But such fraud would be more noticeable and thus easier to detect than a fraudulent claim that an old domicile had been abandoned such that the individual should be allowed to vote in a new, albeit temporary, locale.

Our "looking backward" in time to one's "past" domicile for voting purposes has both legislative and judicial precedent. Section 217 of the Elections Code, enacted contemporaneously with section 200, subdivision (b), entitles a duly registered voter in any precinct in California who removes therefrom within 28 days prior to an election to vote in the voter's abandoned precinct. The purpose of the statute is to assure that the voter is not disenfranchised. (*Kagan* v. *Kearney* (1978) 85 Cal.App.3d 1010, 1017 [149 Cal.Rptr. 867].) As our previous discussion of the circumstances surrounding the enactment of sections 200 through 217 explains, however, the underlying premise of these enactments is that the voter *has acquired* a new domicile. Hence, the 28-day rule of Elections Code section 217 does not directly address the situation presented here, where no new domicile has in fact been established. Nevertheless, we adopt the statutory scheme underlying Elections Code sections 202, 205 and 217, and Government Code sections 243 and 244, that the voters retain their "current" domiciles until they acquire—through the union of act and intent—new domiciles.

Policy considerations also support the use of students' abandoned domiciles for voting purposes. Our adoption of the trial court's rule avoids disenfranchisement. Were we to adopt the holding of the Court of Appeal, anyone who moved from one domicile and had not yet established another would be left without a domicile and thus would be unable to vote anywhere during the period of travel. University students would be especially hard hit, as it is not uncommon for them to relocate at summer's beginning

or end, precisely when voter registration periods close. In communities with large student populations and low vacancy rates, the student's search for a new domicile can be particularly exasperating—and time consuming. Thus, under the Court of Appeal's holding, many students would be subject to disenfranchisement. Such a result is, in itself, intolerable; it also conflicts with our holding that no construction of an election law should be indulged that would disenfranchise any voter if the law is reasonably susceptible to any other meaning (*Otsuka* v. *Hite* (1966) 64 Cal.2d 596, 603-604 [51 Cal.Rptr. 284, 414 P.2d 412]), and it ignores our holding that students 18 years of age or older must be treated the same as other California residents for voter registration purposes (*Jolicoeur* v. *Mihaly* (1971) 5 Cal.3d 565 [96 Cal.Rptr. 697, 488 P.2d 1]).

Specifically, the Court of Appeal has disenfranchised the students by creating an implied presumption that a new domicile is created whenever a person intends to abandon his or her former domicile. The Court of Appeal held: "A person who has moved from his or her voting domicile and who has no intention ever to return there to live does not satisfy [the requirements of section 200, subdivision (b)]. We conclude as a matter of law that such a person is no longer domiciled for voting purposes in the place from which he or she has moved, and *necessarily intends to acquire a new domicile elsewhere,* regardless of his or her subjective expressions of intent with respect to that acquisition." (Italics added.) The problem with the Court of Appeal's analysis is that the students in this case had not in fact acquired new domiciles elsewhere. They had merely established residences. The acquisition of a new domicile requires the union of act and intent. Even if the students intended to acquire new domiciles in the abstract, they had not yet moved to a place where they intended to remain.

The result of the Court of Appeal's presumption is that the students cannot vote in their former domiciles, because they have abandoned them; they cannot vote in the precincts of their current residences, because they do not have the intentions to remain and hence cannot qualify their residence as their domicile; and they cannot vote in their future domiciles, because they do not yet reside there. Such a disenfranchisement cannot be sustained.

Our holding in this case is narrow in its scope. We hold that when a person leaves his or her domicile with the intention to abandon it, and when that person currently resides in a place in which he or she does not intend to remain, that person may vote in the precinct of his or her former domicile until a new domicile has been acquired.

CONCLUSION

The judgment of the Court of Appeal is reversed with directions to affirm the judgment of the trial court confirming the election of Jane Weed. Parties to bear their own costs.

Mosk, J., Broussard, J., and Arguelles, J., concurred.

**EAGLESON, J.**—I dissent. This is one of those unusual cases in which a dissenting justice can say appropriately: "I dissent for the reasons stated in the majority opinion." In my view the Court of Appeal properly construed and applied to the circumstances of this case the statutes governing voter domicile and registration.

The problem in this case is simple. The solution should be.

A voter moves from his residence and voting domicile. He concedes that he does not intend to return to that residence, and is temporarily residing elsewhere. He intends to find a new residence, one that may or may not be in the precinct of his former domicile, at some future, but indefinite, time.

The majority conclude that the precinct of this voter's former residence and voting domicile will continue to be his voting domicile indefinitely until he not only makes up his mind to create a voting domicile elsewhere but actually does so by moving to a new residence at which he intends to remain for the foreseeable future. No matter how often he moves, or how long he remains out of the precinct of his former domicile, he may cast his vote in that precinct until he decides that his current residence is not "temporary."

The majority reason that acceptance of the voter's assertion that, although he has abandoned his former residence and voting domicile without intent to return to that residence, his present residence is only temporary, and therefore permitting him to continue to vote in the former precinct, will avoid fraudulent voting. A greater danger of fraud would exist, they claim, if we conclude that the voter has established a new voting domicile. The majority suggest that fraudulent voting would be easier because voters could move to a precinct in order to influence an election in a location at which they did not intend to remain, and then move back to their prior domicile. The majority make this suggestion notwithstanding the objective evidence and concession by the voter that he has left his former voting domicile—evidence that he has moved himself and his possessions out of his former residence and has lived in a new precinct for more than 28 days.

Somehow, in the view of the majority, fraud is more easily perpetrated if we permit a voter, who has actually gone to the trouble and expense of

moving, to vote in the location to which he has moved, than if we permit him to claim for an indefinite period that he does not intend to remain in that location and therefore remains domiciled for voting purposes in a precinct in which he does not live and to which he says he has no intent to return. Not only is the logic leading to this result untenable, but the result cannot be reconciled with the clear legislative intent that voters who have abandoned their voting domicile, i.e., those who have moved without intent to return, may not continue to vote in the precinct of that domicile for more than 28 days. The strained logic of the majority is not necessary to achieve the goal of avoiding possible disenfranchisement of members of our increasingly peripatetic citizenry, and, as the election at issue demonstrates, the result affords an incentive to engage in a type of fraud the Legislature sought to eliminate. The impact may be minimal in an election like that here involved, one for at-large seats on a city council. In a city which elects council members by district, however, or on measures or candidates who appear only on the ballot for the precinct of the voters' former domicile, the result may well be that persons who no longer reside in the precinct (or city, or county) and have no intention of ever doing so again will control the outcome of the election.

The majority accept and apply an untenable syllogism: Because everyone must have a voting "domicile," a person who has abandoned a domicile with no intent to return thereto, but has not yet established a residence at which he intends to remain for the indefinite future, continues to be domiciled at the location to which he intends not to return.

I suggest that both thoughtful reflection and adherence to the clear legislative intent underlying our election laws support the well-reasoned decision of the Court of Appeal. Once a voter has abandoned his domicile, his place of residence at the close of registration is his voting domicile until such time as he actually moves on to a permanent domicile. This is true whether the voter is a student living "in the woods behind Crown College" or in a van parked on the University of California Santa Cruz "east remote parking lot";[1] a student who has left the dormitory and is staying with friends until he locates an apartment of his own; or a San Francisco city employee who has moved from the City and County of San Francisco but harbors an

---

[1] The trial court expressed concern that the registrar of voters' computer had refused the registration applications of the student voters who had no other address, and on that basis concluded that it was proper for them to use another campus address even though that address was in a different precinct. Permitting an elector to vote at a fictitious address is not the solution to an unlawful refusal to register a voter although such registrations were clearly the least onerous for the students. Mandamus is appropriate to compel the registrar to accept the affidavit of registration for an elector's actual domicile. (See, e.g., *Jolicoeur* v. *Mihaly* (1971) 5 Cal.3d 565 [96 Cal.Rptr. 697, 488 P.2d 1]; *Collier* v. *Menzel* (1985) 176 Cal.App.3d 24 [221 Cal.Rptr. 110].)

"intent" to return to make the city his permanent residence and thus claims the right to vote in his former precinct (where, by coincidence, he is able to influence his civil service benefits). None of these voters is legally entitled to vote in the precinct in which he was formerly domiciled in any election that takes place more than 28 days after he has moved. He has no recognizable interest in casting a vote on any matter that relates to his former domicile but not his present residence, and his vote should not be permitted to dilute those of persons presently domiciled in, and directly affected by, an election concerning the former domicile.

As the majority properly acknowledge, the historical perspective in which the 1976 amendments to the Elections Code,[2] those governing voter residence and domicile, were enacted offers valuable insights into the intent of the Legislature. The amendments reflect the Legislature's recognition of changes in voter demographics that had by the time of the amendments created a need to both make the franchise accessible to a more youthful and mobile population and to prevent the abuse of the franchise made possible by that very mobility. The problem of accommodating the election law to these phenomena has been described by Bruce Bolinger, the consultant to the Assembly Committee on Elections and Reapportionment, in his article California Election Law During the Sixties and Seventies: Liberalization and Centralization (28C West's Ann. Elec. Code (1977 ed.) p. 55) (hereafter Bolinger), a document which the majority acknowledge but whose importance is not adequately considered. As Bolinger notes, the courts had already construed and applied the existing (1961) code provisions to accommodate these changes, and the purpose of the 1976 amendments to the code was to incorporate these decisions, not, as the majority would do, to overrule them.

The first demographic change, that which is reflected in the Santa Cruz election that is the subject of this controversy, followed the lowering of the voting age to 18 years. With that change, a product of the adoption in 1971 of the Twenty-sixth Amendment to the United States Constitution,[3] thousands of college students who had not theretofore been electors were permitted to register to vote. Controversy immediately erupted as to whether these students should be permitted to register in any location other than the domicile of their parents.

That controversy was promptly resolved by this court In *Jolicoeur* v. *Mihaly* (1971) 5 Cal.3d 565 [96 Cal.Rptr. 697, 488 P.2d 1]. Construing and

[2] All statutory references herein are to the Elections Code.
[3] A similar amendment of the California Constitution followed in 1972 when section 1 (now § 2) was added to article II, providing: "A United States citizen 18 years of age and resident in this state may vote."

applying the provisions of the 1961 code to these newly enfranchised voters, we held that 18-year-old citizens had to be treated as emancipated minors for voting purposes. We recognized the possibility that if students registered in their college communities they might control a local election even though they did not intend to remain in that location after graduation. We also recognized, however, that the Legislature had expressly prohibited exclusion of a college student from a local election if the student had abandoned his former domicile. Former section 14283, enacted as part of the 1961 code, then provided: "A person does not gain or lose residence solely by reason of his presence at or absence from a place . . . while a student of any institution of learning. . . . This section shall not be construed to prevent a student at an institution of learning from qualifying as an elector in the locality where he resides while attending that institution when in fact the student has abandoned his former residence." (Stats. 1961, ch. 23, § 3, p. 766.)

Under the 1961 code, therefore, a college student who had left the home of his parents without intent to return, i.e., who had abandoned his former domicile, could properly register and legally vote in the community within which he resided even though that residence was temporary because the student at all times intended to move upon graduation. This was true whether the move to the college community occurred upon matriculation or a month before graduation. The dispositive fact was that the voter had abandoned his former residence. Whether he intended to make his college residence a permanent domicile was irrelevant. Until such time as the voter who had abandoned a former domicile actually established a new domicile, his domicile for voting purposes was his current place of residence—not the domicile he had abandoned.

We recognized in *Jolicoeur, supra,* 5 Cal.3d 565, that if former section 14283 were not construed and applied in this manner to the newly enfranchised 18- to 20-year-old voters, these persons would then be forced or permitted to cast their ballots in elections at their former domicile, elections in which they had no stake in the outcome and which they should not be permitted to influence. "The second major evil accomplished by allowing or forcing voters to vote in districts not their own is that voters of other districts have inflicted upon them a voter with no stake or interest in the outcome of the election. The extent of the evil is not only that residents of California would be asked to decide issues in Arizona or Hawaii. Small towns in California would be especially affected by such a rule, since the number of young people from the town who have left for other areas may be substantial in comparison to the town's total population. Allowing unmarried minors who reside elsewhere to vote may effectively turn a small town over to the control of unconcerned outsiders. Over a century ago we

recognized the wisdom of requiring voters to be residents of the jurisdiction: '[C]itizens . . . should not deal with public questions through the ballot box until they at least [have] the benefit of an opportunity to learn the public wants, of concerting measures the best calculated to provide for them, and of selecting proper men to carry those measures into effect; . . .' (*Bourland v. Hildreth, supra,* 26 Cal. 161, 179.) Allowing minors to vote at fictional residences would compromise the integrity of the political process." (5 Cal.3d at p. 577.) Former section 14283, of course, did not create a special registration status for college students. Its purpose was to ensure that they, like all other voters, would be free to establish a domicile at the place of their actual residence even though the intent of the voter was never that this residence would be his permanent home.

Where the majority errs is in assuming that the code does not now provide for these same persons, those whose ballots were challenged here, and other voters who have abandoned their former domiciles and whose residence at the time of an election is "temporary" because they intend at some future, but possibly indefinite, time to move on. In fact, the same provisions that were in effect at the time of our decision in *Jolicoeur, supra,* 5 Cal.3d 565, govern the instant case.

Sections 201 to 217 did not spring full grown from the legislative consciousness in 1976. They are no more than renumbered versions of the statutes in effect at the time of *Jolicoeur,* appearing then as article 3 (§§ 14280-14291) of the 1961 code. Although modified to define and substitute where appropriate "domicile" for "residence," and to reflect current concerns regarding "sexist" use of gender references, these provisions are a continuation of the 1961 statutes which, as construed prior to their reenactment in 1961, do establish the means by which the domicile of the challenged voters is to be established and govern the proper disposition of this case. Overlooking this, the majority create a new rule, one which conflicts with the judicial construction given the prior statutes and with the legislative intent to incorporate that construction. The majority do so notwithstanding the absence of any indication that the Legislature intended to change the law in this respect and in the face of evidence that the result reached here is one which the Legislature intended to avoid.[4]

For ease of comparison, I set forth the relevant 1961 provisions (Stats. 1961, ch. 23, § 3, pp. 766-767) and their current counterparts with changes

---

[4]The majority suggest that permitting unsettled voters to vote in the precinct of their former domicile is necessary to avoid the danger of "forum shopping." Forum shopping, of course, is just what the challenged voters in this case did. Assuming that such conduct is prevalent, the Legislature has determined that retaining a voting domicile in a precinct in which the voter no longer lives and to which he does not intend to return is the greater of the two possible evils.

indicated, noting first that subdivision (a) of present section 200 ("Except as provided in this article, the term 'residence' as used in this code for voting purposes means a person's domicile.") had no 1961 counterpart.

1961: Section 14280 — "The term of residence is computed by including the day on which the person's residence commenced and by excluding the day of the election."
 1976: Section 201 — "The term of *domicile* is computed by including the day on which the person's *domicile* commenced and by excluding the day of the election."

1961: Section 14282 — "The residence of a person is that place in which his habitation is fixed and to which, whenever he is absent, he has the intention of returning."
 1976: Section 200, subdivision (b) — "The *domicile* of a person is that place in which his *or her* habitation is fixed, *wherein the person has the intention of remaining,* and to which, whenever he *or she* is absent, *the person* has the intention of returning. *At a given time, a person may have only one domicile.*"

1961: Section 14283 — "A person does not gain or lose residence solely by reason of his presence at or absence from a place while employed in the service of the United States or of this State, nor while engaged in navigation, nor while a student of any institution of learning, nor while kept in an almshouse, asylum or prison. This section shall not be construed to prevent a student at an institution of learning from qualifying as an elector in the locality where he resides while attending that institution, when in fact the student has abandoned his former residence."
 1976: Section 206 — "A person does not gain or lose *a domicile* solely by reason of his *or her* presence or absence from a place while employed in the service of the United States or of this state, nor while engaged in navigation, nor while a student of any institution of learning, nor while kept in an almshouse, asylum or prison. This section shall not be construed to prevent a student at an institution of learning from qualifying as an elector in the locality where he or she *domiciles* while attending that institution, when in fact the student has abandoned his or her former *domicile*."

1961: Section 14284 — "A person who leaves his home to go into another state or precinct in this State for temporary purposes merely, with the intention of returning, does not lose his residence."
 1976: Section 202, subdivision (a) — "A person who leaves his *or her* home to go into another state or precinct in this State for temporary purposes merely, with the intention of returning, does not lose his or her *domicile*."

1961: Section 14285 — "A person does not gain a residence in any precinct into which he comes for temporary purposes merely, without the intention of making that precinct his home."

1976: Section 202, subdivision (b) — "A person does not gain a *domicile* in any precinct into which he *or she* comes for temporary purposes merely, without the intention of making that precinct his or her home."

1961: Section 14286 — "If a person removes to another state with the intention of making it his residence, he loses his residence in this State."

1976: Section 203 — "If a person *moves* to another state with the intention of making it his or her *domicile, the voter* loses *his or her domicile* in this state."

1961: Section 14287 — "If a person removes to another state as a place of permanent residence, with the intention of remaining there for an indefinite time, he loses his residence in this State, notwithstanding that he entertains an intention of returning at some future period."

1976: Section 204 — "If a person *moves* to another state as a place of permanent residence, with the intention of remaining there for an indefinite time, he *or she* loses his *or her domicile* in this state, notwithstanding that he *or she intends to return* at some future *time*."

1961: Section 14288 — "The place where a man's family resides is his residence unless it is a place for temporary establishment for his family or for transient objects. Residence in a trailer or vehicle or at any public camp or camping ground may constitute a residence for voting purposes if the registrant complies with the other requirements of this article."

1976: Section 207 — "The place where a *person's* family *is domiciled* is his *or her domicile* unless it is a place for temporary establishment for his *or her* family or for transient objects.

"Residence in a trailer or vehicle or at any public camp or camping ground may constitute a *domicile* for voting purposes if the registrant complies with the other requirements of this article."

1961: Section 14291 — "The mere intention to acquire a new residence, without the fact of removal avails nothing, neither does the fact of removal without the intention."

1976: Section 205 — "The mere intention to acquire a new *domicile,* without the fact of removal avails nothing, neither does the fact of removal without the intention."

A comparison of these 1961 and 1976 provisions should dispel any doubt as to the legislative intent in enacting the 1976 amendments to the code. The Legislature intended to distinguish the concept of residence for voting

purposes from other uses of that term, and to that end adopted the term "domicile," but to continue the substance of the 1961 provisions.

In so doing the Legislature also continued a legislative limitation on the period of time a voter could lawfully vote in the precinct of his former domicile after having abandoned that domicile. That limitation, first enacted in 1973 as section 203.5 (Stats. 1973, ch. 23, § 1, p. 41), became section 217. It now provides: "A person duly registered as a voter in any precinct in California who removes therefrom within 28 days prior to an election shall, for the purpose of such election, be entitled to vote in the precinct from which the person so removed until the close of the polls on the date of such election." These persons, therefore, and no others, are entitled to vote in a precinct in which they are no longer domiciled.

Significantly, the majority fail to explain how the rule they adopt is to be applied to those persons who, while professing that their residence is only temporary, in fact fail over many months to acquire a new domicile. Under the majority's rule, all that is necessary to retain the right to vote in the precinct of one's abandoned domicile is a bona fide belief that one's present living arrangements are only temporary, to a large extent, a subjective determination not easily refuted. How can this construction of the statute be reconciled with the legislative effort to avoid voter abuse and fraud of the type encountered in San Francisco and San Bernardino shortly before the 1976 amendments? Bolinger, *supra*, explained the relevance of this problem to the amendments: "Until revised and renumbered in 1976, the Elections Code defined the residence of a voter as 'that place in which his habitation is fixed and to which, whenever he is absent, he has the intention of returning.' Determining a voter's 'intention' is difficult at best and the migration of voters to suburbia seems to have aggravated the problem as became evident in San Bernardino and San Francisco during 1975 and 1976. In San Bernardino it was the migration in part of the younger generation of Mexican-Americans out of the barrio in the city's First Ward to other areas including surrounding cities, such as Colton and Redlands, while retaining or subsequently resuming their registration in the First Ward. . . . In San Francisco it was the migration of literally thousands of persons from the city to towns in surrounding Bay Area counties while continuing to register and vote in San Francisco, which as the heart of a major controversy over what constituted residence and which, in turn, prompted changes in the state law on residence. . . .

". . .It wasn't until the San Francisco situation dramatized the problem that legislation was introduced to clarify the meaning of residence. [The change] sought to clarify the meaning of voter residence by substituting 'domicile' for 'residence,' the domicile now being the place in which the

individual's habitation is fixed, and to which, 'whenever he or she is absent, the person has the intention of returning.'" (Bolinger, *supra*, pp. 83-86.) This concept of domicile cannot be reconciled with the retention of the right to vote in an abandoned domicile. It was just that approach to "residence" under the former law which the 1976 amendments sought by clarification to eliminate. The majority, however, would construe the change so as to permit the very evil the Legislature sought to overcome—large numbers of voters returning to abandoned precincts to cast their votes in elections in which they have no stake. The majority blinks at history and the factual context giving rise to the legislation.

While acknowledging the legislative history which confirms that the changes that were made in 1976 sought to incorporate some judicial decisions on the concept of domicile and residence (maj. opn. at p. 10, the majority fail to grasp the significance of those decisions. As *Jolicoeur, supra*, 5 Cal.3d 565, demonstrates, a voter who has abandoned his domicile acquires a new one at his place of "temporary" residence even if he does not intend that place to be his permanent residence. It is the abandonment that is crucial. He may not elect to remain in a state of suspended domiciliation by the subjective expedient of harboring hope that at some future time he will find yet another place to live.

The majority suggest that under our construction of the statutes there is no standard by which to limit the ability of a voter who claims to have left his former domicile to fraudulently register to vote in the location of his temporary residence. This concern overlooks the much greater incentive to fraud under the majority reading of the statutes. How long may a voter who is not residing in his claimed domicile continue to vote in the precinct of his former residence? How long does his actual residence remain temporary simply because he claims a subjective intent to find other, more permanent housing? The suggestion that the majority's approach serves to avoid fraudulent registration is simply untenable. To the extent that any objective evidence of the domicile of a voter exists, it lies in his actual physical removal from his former residence and his taking up residence elsewhere. The greater incentive for fraud by far exists if the person who has removed himself and his possessions from his voting domicile to another location need only declare that he intends to move yet again.

The lengthy trial in this case, the necessity of ascertaining the subjective intent of voters no longer resident in the precincts in which they claimed the right to vote, and the impossibility of ascertaining in the individual case the point at which an "intent" not to remain in the voter's actual residence must be recognized as nothing more than a "hope," all underscore the wisdom of the legislative choice. The rule proposed by the majority invites

not only fraud, but also repeated challenges and costly contest proceedings when persons long gone return to vote in the precinct of their former domiciles claiming that their present residence is "temporary" and thus is not yet a "domicile."

The majority also fail to perceive or acknowledge that the rule they create is inconsistent with the express provision in section 204 which excludes from the ballot persons who leave the state intending to remain at their new residence for an indefinite time even if they intend at all times to return to this state; and that in section 207 which permits persons who live temporarily in public camps or camping grounds to establish a domicile at that location even though residence at such locations cannot be presumed to be permanent.

The fear of the majority that some voters may be disenfranchised upon expiration of the 28-day period for reregistration because they have not yet established a new domicile is unwarranted. Persons who fail during that period to find accommodations in which they plan to remain, are domiciled at the location of their current habitation. The Court of Appeal so held when considering the circumstances of the homeless "residents" of Santa Barbara's Fig Tree Park in *Collier* v. *Menzel, supra*, 176 Cal.App.3d 24. The result there is consistent with that which I propose. The county registrar had refused to accept the affidavits of registration submitted by the homeless, claiming that the address was insufficient. The voters were advised that they were legally entitled to vote at their former precinct until they had established new residences. The Court of Appeal disagreed and ordered that the voters be registered at the address given on their affidavits.

Construing and applying section 200 to the situation of the homeless who claimed Fig Tree Park as their residence, the court concluded that the park was a dwelling place or place of habitation for these citizens, and that their signature on an affidavit giving the address of the park as their place of residence was sufficient to establish a present intent to remain there. The court noted the Legislature has expressly sanctioned domicile in a public camping ground, and reasoned that like a camping ground the park was "a physical area where a person can sleep and otherwise use as a dwelling place." (176 Cal.App.3d at p. 31.) None would argue that these citizens intended to make the park their permanent home, but like the college students here, they had abandoned their former domicile, and for the indefinite future intended to return to the park after temporary absences. The park was, for voting purposes, their domicile, just as the domicile of the challenged voters here was the location at which they resided at the time of the election.

The construction adopted by the majority is both completely unrealistic and contrary to legislative intent. I would affirm the judgment of the Court of Appeal.

Lucas, C. J., and Kaufman, J., concurred.

The petition of plaintiffs and appellants for a rehearing was denied June 23, 1988.